*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 34**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

BOBBY L. NEVARES,
*Appellant,*

*v.*

M.L.S. and THE ADOPTION CENTER OF CHOICE, INC.,
*Appellees.*

No. 20120763
Filed February 6, 2015

Fourth District, Provo Dep't
The Honorable Claudia Laycock
No. 104402485

Attorneys:

Joshua K. Peterman, Salt Lake City, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees

William C. Duncan, Salt Lake City, for amicus curiae

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PARRISH, and JUDGE PEARCE joined,
and in which JUSTICE DURHAM joined with respect to Part II.A.

JUSTICE DURHAM authored a concurring opinion.

ASSOCIATE CHIEF JUSTICE NEHRING does not participate herein;
COURT OF APPEALS JUDGE JOHN A. PEARCE sat.

JUSTICE LEE, opinion of the Court:

¶1   This is a paternity proceeding filed by the father of a child conceived in Colorado but born in Utah and placed for adoption here. The father, Bobby Nevares, had no idea his child might be placed for adoption in Utah. And if an adoption had been initiated (as anticipated) in Colorado, Nevares's parental right to withhold

consent to adoption would have remained intact. Yet the mother and the adoption agency claim that Utah law required Nevares to take affirmative steps to perfect his parental rights, *see* UTAH CODE § 78B-6-122, which Nevares failed to fulfill. And they also assert that the child was conceived as a result of criminal activity, and thus that Nevares's parental rights are foreclosed under another provision of the Utah Code, *see* UTAH CODE § 78B-6-111.

¶2   The district court agreed with the mother and the adoption agency on the first point, and thus granted summary judgment against Nevares. We reverse. We first hold that Utah Code section 78B-6-122 merely required Nevares to fulfill the requirements of Colorado law to protect his interests as a father. And because Nevares's parental rights would have remained intact under Colorado law unless and until he was given notice and an opportunity to be heard, we conclude that his parental rights are likewise preserved under Utah law. Second, we interpret Utah Code section 78B-6-111 not to apply to sexual activity between non-Utahns outside of Utah, and thus conclude that this provision has no application here.

## I. BACKGROUND

¶3   From December 2009 to January 2010, Bobby Nevares was involved in a sexual relationship with M.L.S. in Colorado. The two were not married, and their relationship was brief. But at some time during this period M.L.S. became pregnant.

¶4   In August, M.L.S. told Nevares that she was pregnant and intended to place the child for adoption. Nevares knew nothing of the pregnancy before then, and he soon took steps toward contesting the anticipated adoption. He visited a Colorado adoption agency and filled out an "Anticipated Relinquishment Reply Form," checking a box that indicated his intent both to contest the termination of his parental rights and to petition the court to make a determination as to his parental relationship with the child.

¶5   M.L.S. later traveled to Utah, where she gave birth to her child (on September 29) and also placed it for adoption. She never told Nevares of her plans to come to Utah to deliver the child or to proceed with an adoption. Nor did Nevares have any idea of these plans.

¶6   Two days after learning of the child's birth in Utah, Nevares filed a petition to establish paternity in a Utah district court. He had not previously made a parallel filing in Colorado. His only act in

Colorado was his visit to the adoption agency to fill out the Reply Form.

¶7 Respondents, M.L.S. and The Adoption Center of Choice, moved for summary judgment on Nevares's petition on two grounds. First, they alleged that Nevares lacked standing to contest the adoption under Utah Code section 78B-6-111 because the child was conceived "as a result of conduct which would constitute [a] sexual offense" in Utah. Second, they asserted that Nevares had failed to establish parental rights in the child in Colorado prior to the mother placing the child for adoption, as purportedly required by Utah Code section 78B-6-122(1)(c)(i).

¶8 The district court rejected respondents' first argument. It found Utah Code section 78B-6-111 inapplicable to sexual activity in Colorado, and thus deemed respondents' reliance on this provision "not well founded." But the district court granted summary judgment on the basis of respondents' second point. Specifically, the court interpreted Utah Code section 78B-6-122 to require Nevares to affirmatively establish parental rights in the child, and held that his failure to do so foreclosed his parental rights in Utah. Citing Colorado Revised Statutes sections 19-4-105 to -107, the district court identified various affirmative steps that Nevares could have taken to establish his paternity in Colorado. And while conceding that Colorado law does not require a father to follow these steps, the district court interpreted Utah law to require a father to affirmatively establish paternity before acquiring any right to notice of an adoption proceeding. Thus, because Nevares failed to follow these steps under Colorado law to establish paternity, the district court concluded that he had forfeited any rights he may have had to contest the adoption under Utah law.

¶9 Nevares filed this appeal. Our review of the district court's summary judgment decision is de novo. *Bahr v. Imus*, 2011 UT 19, ¶¶ 12–18, 250 P.3d 56.

## II. DISCUSSION

¶10 The threshold question on appeal concerns the meaning of Utah Code section 78B-6-122(1)(c)(i). The district court construed this provision to require Nevares to take affirmative steps to establish his paternity in Colorado. We read the statute differently. We interpret it merely to incorporate Colorado law by reference, and thus find this provision not to bar Nevares's establishment of paternity.

¶11 That determination requires us to consider respondents' assertion that Nevares's parental rights are foreclosed under Utah Code section 78B-6-111. On this question we agree with the district court. We interpret this provision not to apply to sexual activity between non-Utahns outside of Utah, and thus reject this alternative ground for respondents' motion for summary judgment.

*A. The Standard for Establishing Parental Rights Under Colorado Law Under Section 122(1)(c)(i)(B)*

¶12 As a general rule, the consent of an unmarried biological father is not required when a child who is six months of age or less is placed for adoption. UTAH CODE § 78B-6-121(3). Our law recognizes exceptions to this rule. *See, e.g.,* (requiring the father's consent if, before the mother consents to adoption, the father files paternity proceeding, submits an affidavit required by statute, and offers to pay and pays expenses). One such exception is implicated here. It arises when the father did not know and could not reasonably have known that the child would be placed for adoption in Utah. *See id.* § 78B-6-122(1)(c)(i).

¶13 The code identifies as "qualifying circumstances" a list of conditions indicating a mother's likelihood of placing the child for adoption in Utah. *Id.* § 78B-6-122(1)(a) (listing as conditions (i) residence of the mother or the child in Utah for at least 30 consecutive days, (ii) the mother's intent to give birth to the child in Utah, (iii) the child's birth in Utah, or (iv) the mother's intent to consent to adoption in Utah or under Utah law). And it provides that the consent of the father is required if the father did not know and could not reasonably have known of a qualifying circumstance *and* if the father "fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child, imposed by: (I) the last state where the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that the mother resided in before the mother executed the consent to adoption." *Id.* § 78B-6-122(1)(c).

¶14 The parties agree that Nevares did not know and could not reasonably have known of a qualifying circumstance in this case. Thus, the question presented concerns the meaning of the provision requiring a father to have "fully complied" with the "requirements" of the law of Colorado (the "last state" where he knew that M.L.S. resided) "to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the

child." Respondents contend (and the district court agreed) that this provision contemplates proactive, affirmative efforts by Nevares to "establish" his "parental rights." And because Nevares failed to avail himself of opportunities under Colorado law to perfect his rights in paternity, *see infra* ¶ 20 (discussing paternity proceedings under Colorado law), the district court concluded that he had failed to satisfy section 122(1)(c)(i)(B).

¶15 We reject the district court's reading of the statute on two grounds. First, we consider the verb "establish" in the broader context in which it appears in the statute, and conclude that section 122(1)(c)(i)(B) merely incorporates by reference the "requirements" of the mother's home state law for establishing parental rights. And we note that the paternity option identified by respondents is not a *requirement* of Colorado law, but only an *option* for establishing paternity. Second, and in any event, we note that the district court's contrary construction of the Utah statute would implicate serious due process concerns, as it would require an unwed father in Colorado who had no idea of any plans for a Utah adoption to construe Colorado law through the lens of the Utah statute.

¶16 For these reasons we conclude that section 122(1)(c)(i)(B) cannot stand as a bar to the paternity petition on respondents' motion for summary judgment. We hold, specifically, that Nevares's petition cannot be dismissed on the ground that he failed to fulfill any "requirements" of Colorado law for establishing his parental rights.

1. Statutory context

¶17 The reference to "establish[ing]" parental rights must be interpreted in context. And in context the statute speaks not of a general requirement of *establishing* parental rights, but of "fully compl[ying] with the *requirements* to establish parental rights" prescribed by the laws of the mother's last state of residence or the state where the child was conceived. UTAH CODE § 78B-6-122(1)(c)(i)(B) (emphasis added). The reference to "requirements" of the mother's home state laws is significant. In context this is an unmistakable incorporation of the laws of the "last state" of the mother's residence. And it is a clear reference to laws that go to "requirements" for establishing parental rights.

¶18 That context makes a significant difference in this case. Under Colorado law an unwed father's parental rights are presumptively preserved intact in the face of an impending adoption. Before an adoption may proceed, the "agency or person having custody of the

child" must "file a petition . . . to terminate the parent-child legal relationship of the other parent, unless the other parent's relationship to the child has been previously terminated or determined by a court not to exist." COLO. REV. STAT. § 19-5-105(1). And before terminating a father's parental rights, courts are required to inquire as to his identity, *id*. § 19-5-105(2), and must give him notice of the impending proceeding, *id.* § 19-5-105(3).[1] Once the court identifies the father, it "shall set a hearing, as expeditiously as possible, to determine" whether his parental rights should be terminated. *Id.* At the hearing, the father is required to appear to assert his rights and to show that he can "personally assume legal and physical custody, taking into account the child's age, needs, and individual circumstances." *Id.* § 19-5-105(3).

¶19 This context and background weigh heavily against the district court's construction of section 122(1)(c)(i). The question under the Utah statute concerns not just Colorado law for "establish[ing]" parental rights in general, but the "requirements" of that state law for doing so. And the *requirements* of Colorado law are simple and straightforward: An unwed father anticipating a planned adoption need only await notice of the required petition for termination of his (presumptively intact) parental rights, and then appear at the termination proceeding and show that he can "personally assume legal and physical custody" of the child. *Id.*

¶20 As respondents indicate, there are other mechanisms in Colorado law for an unwed father to proactively "establish" his parental rights—as by filing a paternity petition. *See* COLO. REV. STAT. § 19-4-104 (providing that "[t]he parent and child relationship may be established . . . between a child and the natural father" by filing a paternity petition); *id*. § 19-4-105.5 (setting forth procedures for filing paternity petition, which "may be commenced prior to the birth of a child"). But these are *options*, not *requirements* of Colorado law. For an unwed father anticipating an adoption, the *requirements* of Colorado law appear to be limited to compliance with section 19-5-105(3) (appearance in the termination proceeding and showing that he can personally assume legal and physical custody).

---

[1] Even if the father's identity is unknown, some notice is required. Colorado law requires publication notice in such circumstances in order to give the father a chance to step forward and assert his rights. COLO. REV. STAT. § 19-5-105(5).

¶21 This conclusion is not undermined, as respondents assert, by the conjunctive "and" in Utah Code section 122(1)(c)(i)(B). Granted, the conjunction suggests that Utah law contemplates that the notion of a father "fully compl[ying] with the requirements to establish parental rights in the child" is distinct from the concept of the father "preserv[ing] the right to notice of a proceeding in connection with the adoption of the child." *Id*. But to some extent those concepts merge under Colorado law, which is significant given our view that section 122(1)(c)(i)(B) merely incorporates the requirements of Colorado law by reference. And in any event the statute speaks only of *requirements*, and again the only requirement for establishing parental rights under Colorado law was to appear and make a showing in the termination proceeding required in anticipation of an adoption. Nevares cannot be faulted for not appearing and not making the anticipated showing, as no Colorado adoption was ever initiated and thus no termination proceeding ever proceeded.

¶22 It is likewise beside the point that Nevares failed to file a paternity claim within twenty-one days of receiving notice from a Colorado adoption facility of M.L.S.'s plan to pursue expedited relinquishment of the child in Colorado. Respondents point to Nevares's failure to file a response to this notice as a basis for questioning his fulfillment of his obligations under Colorado law to establish his parental rights. But this argument fails as a matter of law on the face of the governing Colorado statute. The cited provision requires the recipient of a notice like that sent to Nevares to file a paternity claim "[n]o later than twenty-one days after the date of notice . . . *or* before a relinquishment petition is filed with the court, *whichever occurs later*." COLO. REV. STAT. § 19-5-103.7(4)(a)(V)(B) (emphasis added). This limitations provision has no application in this case because no relinquishment petition was ever filed with a court in Colorado. So again Nevares cannot be charged with falling short in any way under Colorado law, as the cited provision never came into play given that the anticipated Colorado adoption proceeding never went forward.

2. Due process

¶23 Even if the statutory reference in Utah Code section 78B-6-122(1)(c)(i)(B) to fulfilling the laws of the mother's last home state for "establish[ing]" parental rights could plausibly be read to incorporate Colorado paternity procedures, that construction would fail on the ground that it would raise grave concerns under the Due Process Clause. The essence of due process is reasonable notice and

an opportunity to be heard. *Salt Lake Legal Defender Ass'n v. Atherton*, 2011 UT 58, ¶ 2, 267 P.3d 227. That right is a significant protection against the arbitrary extinguishment of important rights—in a cause of action, in property, or otherwise. Here the right at stake—of a parent in establishing a relationship with his child—is a matter of great significance. So Nevares has a constitutional right to reasonable notice of a proceeding in which such parental right might be terminated. And the district court's construction of the statute would effect a serious incursion on that right to notice and an opportunity to be heard. *See infra* ¶¶ 38–46 (discussing a parallel due process concern with extraterritorial application of Utah criminal law through Utah Code section 78B-6-111).

¶24 Under the district court's approach, Nevares would have been required to proactively seek out opportunities made available to him for establishing his parental rights under Colorado law. The problem with this approach is that those opportunities are merely permissible *options* for a putative father in Colorado. They are not prerequisites to preserving or fixing a father's parental rights. *See supra* ¶ 20.

¶25 Therein lies the due process problem. If we construed Utah law to require Nevares to fulfill requirements not imposed on him by Colorado law, we would be holding him to a legal regime to which he could not reasonably have expected to be bound. Nevares, after all, did not know and could not reasonably have known that his child would be placed for adoption in Utah. So he would reasonably have expected Colorado law to control his parental rights in the context of an anticipated adoption. In these circumstances, Nevares could not reasonably have been charged with following a directive of *Utah law*—to proactively pursue a paternity case that Colorado law allowed but did not require—because he had no basis for anticipating the applicability of Utah law.

¶26 This is another ground for our construction of Utah Code section 122(1)(c)(i)(B). We interpret this provision simply to incorporate the "requirements" of the mother's last home state for the establishment of the father's parental rights. And we note that this approach has the significant virtue of avoiding a substantial due process problem.

### B. Applicability of Section 111

¶27 Under the Utah Adoption Act, a biological father is barred from contesting an adoption where "the child who is the subject of the proceeding was conceived as a result of conduct which would

constitute any sexual offense described in Title 76, Chapter 5, Part 4, regardless of whether the biological father is formally charged with or convicted of a criminal offense." UTAH CODE § 78B-6-111. Respondents invoked this provision as an alternative basis for their motion for summary judgment. They noted that when the child in question was conceived Nevares was twenty years old and M.L.S. was only fifteen, and thus asserted that the child was conceived as a result of conduct amounting to statutory rape under Utah law. *See* UTAH CODE § 76-5-401 (describing the crime of "unlawful sexual activity with a minor"; defining "minor" as a "person who is 14 years of age or older, but younger than 16 years of age at the time [of] the sexual activity"; and identifying unlawful sex acts, including "sexual intercourse with a minor").

¶28 The district court rejected this argument as "not well founded." We agree. For reasons set forth below, we hold that section 111 is not implicated where, as here, the conduct in question could not have "constitute[d] a sexual offense" under the referenced part of the Utah code because the activity involved non-Utahns outside of Utah, and thus could not have sustained a criminal charge under Title 76, Chapter 5, Part 4.

¶29 Section 111 is aimed at "conduct which would constitute a[] sexual offense described in Title 76, Chapter 5, Part 4, regardless of whether the biological father is formally charged with or convicted of a criminal offense." UTAH CODE § 78B-6-111. The question presented is the basis for establishing "conduct" that would "constitute a[] sexual offense" under Utah law. Two alternatives are presented: (a) respondents' view—that section 111 requires only proof that the father engaged in conduct fulfilling the *actus reus* and *mens rea* elements of a Utah crime; and (b) Nevares's position—that section 111 requires proof of those elements and also the jurisdictional prerequisite to a criminal charge or conviction, *see* UTAH CODE § 76-1-201(1) (providing that person is subject to prosecution under Utah law only if he commits an offense "wholly or partly" in Utah); *id.* § 76-1-501(3) (providing that "jurisdiction" must be established by the prosecution "by a preponderance of the evidence"). Admittedly, this is a difficult question, as the evidence of the text's meaning is not overwhelmingly apparent at first blush. That said, we adopt the latter reading on three grounds: (1) the statute's "regardless" clause, which suggests (when read in light of semantic canons of construction) that *all matters* sufficient to sustain a "formal[] charge[]" or "convict[ion]" must be established to trigger section 111; (2) the well-settled presumption against extraterritorial

application of statutory provisions, which counsels in favor of limiting section 111 to offenses committed in Utah even if the statute were silent regarding its application to conduct outside of Utah; and (3) the canon of constitutional avoidance, which counsels in favor of limiting section 111 to offenses committed in Utah in light of the grave due process problems associated with respondents' approach.

1. The "regardless" clause and semantic canons of construction

¶30  Section 111 speaks to the limitations on its application in the "regardless" clause. There we are told that the statute is implicated "regardless of whether the biological father is formally charged with or convicted of a criminal offense." UTAH CODE § 78B-6-111. Under this clause, it is clear that a father's rights are foreclosed under section 111 even without a "formal[] charge[]" by a prosecutor or a "convict[ion]" in court. That formulation, moreover, also conveys a negative implication. Because the "regardless" clause is the only express limitation on the face of this statute, we can also infer that there are no other limitations. Thus, the implication is that *all* preconditions to a "formal[] charge[]" or "convict[ion]" must be fulfilled to trigger section 111.

¶31  That implication follows from established canons of statutory construction. One such canon is the *expressio unius* principle of interpretation—the notion that the statutory expression of one term or limitation is understood as an exclusion of others. *See Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984. Section 111 articulates a single limitation on the proof of "conduct" constituting a criminal "offense": Such proof does not require a "formal[] charge[]" or "convict[ion]." And under the *expressio unius* canon, the expression of that limitation is an implied rejection of others.[2]

---

[2] This canon, like most all others, is by no means ironclad. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465. "Canons of construction . . . are not formulaic, dispositive indicators of statutory meaning. They are merely tools that guide our construction of statutes" in accordance with rules of thumb as to "ordinary usage and understanding of language." *Id*. Such canons are always subject to—and sensitive to—context. *Id*. (noting that canons "must be understood as one of several *contextual* indicators of meaning") (emphasis added).

For these reasons, the concurring opinion falls short in its efforts to repudiate this canon as a "formal propositional fallacy." *Infra* ¶ 61,

(Continued)

¶32 The reference to a "*formal*[] charge" is significant. Each term of a statute has significance,[3] and this one appears to underscore that all but an actual—"formal[]"—charge is required. And under Utah law, as noted above, the proof necessary to sustain a charge of and conviction on a criminal offense includes not only the *actus reus* and *mens rea* elements of a crime, but also the jurisdictional basis for a criminal charge.[4] *See* UTAH CODE § 76-1-201(1); *id*. § 76-1-501(3).

¶33 The concurrence reads the statute differently. To establish "conduct which would constitute a[] sexual offense" under Utah law, the concurrence would require proof of only the *actus reus* and *mens rea* "elements" of a crime. *Infra* ¶ 65. But that approach ignores

---

n.1 (quoting BLACK'S LAW DICTIONARY for the proposition that *expressio unius* is not "lexicographically accurate"). The point of invoking the canon is not to offer it as an ironclad rule. Thus, we understand and agree that "[s]ometimes" the expression of one limitation "implies the denial of the equivalent right or privilege in other kinds" and "sometimes it does not." *Id*. And we agree that "whether it does or does not depends on the particular circumstances of context." *Id*. But that does not render the canon invalid. It simply makes it sensitive to context. And here we find the context to sustain its invocation.

[3] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863.

[4] This is true even in light of UTAH CODE 76-1-501(3), which states that jurisdiction is not an "element" of an offense in the sense of being subject to proof beyond a reasonable doubt. For present purposes that is a distinction without a difference. The point is that the prosecution bears the burden of asserting and proving jurisdiction to sustain a "formal[] charge" or "convict[ion]" of an offense under the Utah criminal code. And that sustains the applicability of section 111 under the "regardless" clause, *regardless* of whether jurisdiction is to be proven beyond a reasonable doubt or merely by a preponderance of the evidence.

The notion that jurisdiction is a matter not of substantive criminal law but of criminal procedure, *infra* ¶ 13, n. 3, is also a red herring. Jurisdiction is a matter that must be *proven by the prosecution* under the Utah criminal code. And in that sense—the only sense that matters here— jurisdiction is substantive, not procedural.

the *expressio unius* implications of the "regardless" proviso of section 111.[5]

¶34 It also runs afoul of a related canon: It reads into the statute a limitation not expressly stated on its face.[6] Thus, instead of requiring proof of *all* matters other than those covered by the "regardless" clause (no "formal[] charge" or "convict[ion]"), the concurring justices draw an arbitrary line short of those standards. They interpret the statute, in other words, to include an additional limitation. In their view, the statute really means to say "regardless of whether the biological father is formally charged with or convicted of a criminal offense *and regardless of whether the prosecution could establish a jurisdictional prerequisite to make such a charge or sustain a conviction.*" We find no room in section 111 for that limitation, and we deem it foreclosed by the terms expressly stated therein. We accordingly conclude that section 111 is not implicated where there is no jurisdictional basis for a formal charge under Title 76, Chapter 5, Part 4 of the code because the sexual conduct at issue was not "wholly or partly" in Utah.

2. The presumption against extraterritorial effect

¶35 That conclusion would hold even if section 111 were silent on the question whether jurisdiction is a part of establishing "conduct which would constitute a[] sexual offense" under Utah law. Under a deeply rooted and longstanding canon of construction, statutes are presumed not to have extraterritorial effect. *See U.S. Bond & Fin. Corp. v. Nat'l Bldg & Loan Ass'n of America*, 17 P.2d 238, 239 (Utah 1932) ("It is fundamental that a statute can have no extraterritorial effect."). This presumption is a gap-filler, operating under a "clear

---

[5] The "statute's subjunctive phrasing—'conduct which *would* constitute'"—is admittedly "less than perfectly clear." *Infra* ¶ 59. But there is a "plausible interpretation of that phrasing that supports" our approach. *Infra* ¶ 59. The subjective "would" is an apparent reference to the "regardless" clause: It emphasizes that the statute is implicated even without a "formal[] charge[]" or "convict[ion]."

[6] *See Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994) ("[C]ourts are not to infer substantive terms into the text that are not already there."); *Olsen*, 2011 UT 10, ¶ 18 (applying this canon to conclude that Utah Code section 52-6-201(1) "leaves no room for this court to add conditions to the right of reimbursement that are not set forth expressly by legislation").

statement" rule. It provides that unless a statute gives a "clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 262–65 (2010); *see also State v. Reed*, 709 P.2d 391, 392 (Utah 1985) (invoking the presumption "absent legislative enactment to the contrary").

¶36 When the Utah legislature enacted section 111, it did so against the backdrop of this longstanding presumption. We should respect this presumption in our effort to discern the legislature's intent. By following the presumption in interpreting the statute, moreover, we also protect the legitimate expectations and reliance interests of those who are bound by its terms. A person in Nevares's shoes could not reasonably have anticipated that section 111 would foreclose his parental rights if a child conceived as a result of his sexual activity in Colorado were brought to Utah to be placed for adoption here. Had Nevares considered section 111, he would reasonably have understood it to apply only to sexual offenses with a jurisdictional connection to Utah.[7] That conclusion, moreover, would doubtless have been informed by an intuitive sense of the presumption against extraterritoriality, as even non-lawyers have a sense that criminality is the domain of the separate states, and that activity wholly in one state cannot properly be subject to criminal charges in another.

¶37 The presumption against extraterritoriality is a sufficient basis for our decision limiting section 111 to conduct satisfying the jurisdictional prerequisites to a formal charge or conviction of a criminal offense. At the very least, we can conclude that section 111 gives no "clear indication of an extraterritorial application." *Morrison*, 561 U.S. at 255. At a minimum, it can be said that the statute is silent on the question whether sexual conduct between non-Utahns outside of Utah could "constitute a[] sexual offense"

---

[7] Respondents effectively conceded this point at oral argument. In response to questions from the court, counsel acknowledged that Nevares's sexual contact with M.L.S. was not a violation of Utah criminal law at the time of the subject child's conception, and that it did not become a crime when the child was subsequently born in or placed for adoption in Utah. Nevares undoubtedly viewed the matter the same way, and his reliance interests under the presumption against extraterritoriality are accordingly entitled to respect.

under Utah law. And the lack of statutory clarity on that matter is sufficient to foreclose its application to conduct bearing no jurisdictional connection to Utah.[8]

3. The canon of constitutional avoidance

¶38 Finally, the same conclusion holds under the canon of constitutional avoidance. Under this canon the courts may "reject[] one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. Thus, if there are grave doubts about section 111's constitutionality if it applies without regard to any jurisdictional nexus to Utah, we may reject that construction in favor of a plausible alternative that avoids such doubts. We do so for reasons explained below.

¶39 The Due Process Clause has long been understood to establish limits on the arbitrary extension of the power of the state on persons not within its territorial bounds or jurisdiction. One familiar application of this principle is found in constitutional limitations on

---

[8] It is no answer to assert that section 111 does not criminally penalize Nevares for his sexual conduct in Colorado. *Infra* ¶ 73. Presumably Mr. Nevares views the potential loss of his parental rights as a substantial punishment (perhaps greater than a criminal fine or temporary term of confinement). *See Santosky v. Kramer*, 455 U.S. 745, 756–57 (1982) (observing that parental rights termination proceedings "are both particularly important and more substantial than mere loss of money," while holding that proof must be made on "clear and convincing evidence" notwithstanding "the state's civil labels and good intentions," given that such proceedings "threaten the individual involved with a significant deprivation of liberty or stigma" (internal quotation marks omitted)). But in any event the point is that section 111's bar on a father's rights is tied to the establishment of "conduct which constitutes a[] sexual offense" under Utah law. And the concurring opinion would read that provision to have extraterritorial effect—in a manner running afoul of the above-stated presumption.

Our conclusion does not infer an "exception" on the Adoption Act's extraterritorial application, or add an exemption that is "not apparent on the statute's face," as the concurrence charges. *Infra* ¶ 64. We simply read section 111 not to impose consequences for extraterritorial conduct.

the territorial jurisdiction of our courts. In this area, it is well-settled that "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) (internal quotation marks omitted); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) ("[T]he Due Process Clause 'does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.'") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

¶40 Yet this is not the only application of this principle of due process. In a range of decisions involving the extraterritorial application of federal law (to conduct outside the United States), the federal courts have held that "the Government [must] demonstrate that there exists a sufficient nexus between the conduct condemned and the United States such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant." *United States v. Medjuck*, 156 F.3d 916, 918 (9th Cir. 1998) (internal quotation marks omitted). This principle has likewise been extended to the arbitrary extraterritorial application of state law. *See Becton, Dickinson & Co. v. Dep't of Revenue*, 422 N.E.2d 1350, 1352 (Mass. 1981) (explaining that state taxation of income generated by interstate activities requires "a minimal connection or nexus between the interstate activities and the taxing State"). The essential premise of these decisions is the notice principle at the heart of the due process guarantee, which gives rise to a prohibition of arbitrary state action in the absence of such notice.[9]

---

[9] We also acknowledge that this due process argument is far from conclusive. For reasons identified in the concurrence, *infra* ¶¶ 69, 72, the application of Utah law to a father of a child placed for adoption here is by no means arbitrary. Utah certainly has an interest in regulating adoptions, and in so doing in determining the rights of fathers. Thus, our analysis here is presented only as a matter of constitutional avoidance—of identifying grave constitutional questions, and not of making a conclusive determination of constitutionality. As noted below, *infra* ¶ 50, n.16, we leave open the legislature's prerogative of amending section 111, subject to the

(Continued)

¶41 If section 111 is construed to encompass Nevares's extraterritorial conduct, serious due process questions would arise under these cases. Under respondents' view of the statute, a father's parental rights may be cut off by a consequence prescribed by Utah law for conduct lacking any nexus with the state. If that is what section 111 says, a serious due process question would arise.

¶42 A putative father in Nevares's position—engaging in sexual activity in Colorado, without any connection to Utah—may not reasonably anticipate that *Utah law* could penalize his behavior by cutting off his parental rights in a child conceived as a result of such sexual activity. Instead, an individual in Nevares's position would arguably look to Colorado law on the matter. *See infra* ¶ 49 (concluding that Colorado law should apply on remand). And Colorado law, as we understand it, would not have foreclosed Nevares's parental rights based on his sexual relationship with M.L.S. *See infra* ¶ 48; COLO. REV. ST. § 19-5-105.5(3) (authorizing a victim of rape or sexual assault to file a petition "to terminate the parent-child legal relationship" of the father of a child "conceived as a result of an act that led to the parent's *conviction* for sexual assault or for a conviction in which the underlying factual basis was sexual assault" (emphasis added)). Thus, interpreting section 111 to extend to Nevares's conduct in Colorado would impose on him a significant consequence that he could not have anticipated under the law that he would have presumed to apply at the time he engaged in sexual activity in Colorado. This would introduce serious due process concerns under the above-cited cases.[10] And that is a further basis for interpreting section 111 the other way, to avoid this constitutional question.

---

limitations of the constitution (which we highlight but do not resolve here).

[10] In so noting, we do not contend "that legislatures may never attach civil consequences to criminal conduct without notice." *Infra* ¶ 71, n.4. The point is simply that the consequence of this application of section 111—the loss of the parental right to object to an adoption—is sufficiently significant to implicate serious due process concerns. And that concern is heightened where, as here, the father's sexual activity was arguably legal in the state in which it took place, and would not have led to the loss of his parental right to object to an adoption.

¶43 The concurring opinion's objections to this analysis are unpersuasive. First, we have no quarrel with the notion that the Utah courts have territorial jurisdiction over the adoption case. *Infra* ¶ 69 (Durham, J., concurring). The constitutional question presented, however, is not the territorial jurisdiction of the Utah courts, but the due process basis for applying substantive Utah law herein. And on this matter, there is at least a grave constitutional doubt concerning the extraterritorial application of section 111—an application that would impose a substantial penalty (a *per se* bar on a father's right to object to an adoption) for conduct wholly in Colorado and bearing no nexus to Utah.

¶44 It is no answer to note that "this is not a criminal case." *Infra* ¶ 69. Granted, the due process question highlighted here would be greatest in the field of criminal law. But it is not necessarily limited to that field.[11] And the penalty in question—a *per se* bar on a father's parental right to object to an adoption—is a matter that at least some would perceive as *more* significant than a criminal fine or prison term.[12] There is significant constitutional doubt as to whether the consequence prescribed by section 111 can be imposed on the basis of conduct lacking any jurisdictional nexus to Utah.

¶45 In so noting, we are by no means foreclosing the applicability of Utah adoption law in a Utah adoption proceeding. For most questions arising in the course of a Utah adoption, Utah law would apply—even as to the matter of a father's parental rights, and even absent a substantial nexus between the father and the forum state.

---

[11] *See Quill Corp. v. North Dakota*, 504 U.S. 298, 308 (1992) (explaining that whether the Due Process Clause permits a state to tax a corporation depends on the "magnitude of [the corporation's] contacts" with the taxing state); *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 137 (1912) (giving a New York surety statute extraterritorial effect "would operate as a denial of due process of law").

[12] *See Santosky*, 455 U.S. at 756–57 (observing that parental rights termination proceedings "are both particularly important and more substantial than mere loss of money," while holding that proof must be made on "clear and convincing evidence" notwithstanding "the state's civil labels and good intentions," given that such proceedings "threaten the individual involved with a significant deprivation of liberty or stigma" (internal quotation marks omitted)).

*See infra* ¶ 69. But section 111 is different. It is a law regulating sexual activity—by imposition of a substantial penalty aimed at disincentivizing such activity. And for reasons noted above, the extension of that provision to activity bearing no jurisdictional nexus to Utah would raise serious due process concerns.[13]

---

[13] The concurring opinion acknowledges that "a person cannot be held criminally liable for conduct unless she has notice that the conduct is criminal." *Infra* ¶ 70. But while conceding that "[n]otice of the conduct's criminality would be necessary," the concurrence insists that "perfect notice of the conduct's consequence would not." *Infra* ¶ 70. And in an effort to support this conclusion, the concurrence asserts that "[i]f this were not the case, then . . . a statute establishing a sex offender registry could not apply to someone who committed his sexual offense before it was enacted, or to someone who committed his offense in a jurisdiction without such a law." *Infra* ¶ 71.

We are troubled by this premise and find the example distinguishable. The proposed distinction between "criminality" and "consequences" of criminal behavior is overbroad. Granted, a felon who moves to a new state may find himself subject to new regulations and restrictions. But he may not be subject to new punishment, and is entitled to notice before the "consequence" of such punishment is imposed. Sex offender registries, moreover, are distinguishable. Such registries have been upheld against constitutional attack on the ground that they constitute a "regulatory scheme" that is "civil" and "nonpunitive," *see Smith v. Doe*, 538 U.S. 84, 105 (2003) (upholding Alaska sex offender registry against ex post facto challenge), not because sex offenders lack a due process right to "perfect notice" of the "consequences" of their behavior, *infra* ¶ 18. The permanent loss of a parental right is a significant consequence of criminal behavior. The arbitrary imposition of this consequence—without any notice—is at least questionable as a matter of due process.

In so stating, we do not hold that the consequence of a loss of the parental right to object to an adoption amounts to criminal punishment for the underlying behavior. Our point is more limited—that the consequence is significant enough to raise serious doubts about the constitutionality of section 111 under the Due Process Clause if applied to conduct lacking a jurisdictional nexus to Utah. *See Santosky*, 455 U.S. at 756.

¶46 We interpret section 111 to avoid that problem. We do so, moreover, without conclusively resolving this due process problem—by noting, instead, that the constitutional question presented is sufficiently "grave" to merit our avoidance of it.[14] *See Utah Dep't of Transp.*, 2014 UT 24, ¶ 23.

### III. CONCLUSION

¶47 For the above reasons we reverse the decision dismissing Nevares's paternity petition on summary judgment. And we remand for further proceedings in the district court.

¶48 In so doing, we emphasize the limited nature of our holding. First, we do not conclude that a biological father whose child is conceived as a result of sexual misconduct in another state is immune from *any* bar to his parental rights in an adoption proceeding in Utah. Our analysis of this issue is based on our construction of Utah Code section 78B6-111, which we find inapplicable in this case. That conclusion, however, may still leave room for the application of other laws affecting a father's rights, such as laws authorizing a victim of rape or sexual assault to file a petition "to terminate the parent-child legal relationship" of the father of a child "conceived as a result of an act that led to the parent's *conviction* for sexual assault or for a conviction in which the underlying factual basis was sexual assault." *See* COLO. REV. ST. § 19-5-105.5(3) (emphasis added).

¶49 Nevares contends that this provision should govern any determination whether his sexual conduct in Colorado would operate as a bar on the assertion of his parental rights. We agree. The premise of this holding is in the terms of section 111 (which does not apply to this case for reasons noted above) and in the language of the Colorado statute (which plainly does apply).[15]

---

[14] In light of our interpretation of section 111, which is informed by procedural due process concerns, we need not and do not reach the substantive due process question addressed by the concurrence. *See infra* ¶¶ 74–76.

[15] Utah law, of course, would regulate an adoption proceeding in Utah courts. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 289 (1971). But the cited Colorado provision is not an adoption provision; it is a law regulating sexual activity—by prescribing a penalty (termination of parental rights) aimed at disincentivizing

(Continued)

¶50 Nevares's parental rights would appear to be unaffected by the cited Colorado provision, as he was never convicted of sexual assault. But provisions like the cited Colorado statute are the answer to the concern that our construction of section 111 could allow a man who fathers a child in another state as a result of a rape to assert his parental rights in an adoption taking place in Utah. *See infra* ¶ 79–81. And, in any event, such laws are not the only recourse. In Utah as elsewhere, a petition to terminate parental rights may be granted upon a showing of a parent's unfitness or incompetence, based, for example, on "a history of violent behavior." *See* UTAH CODE § 78A-6-508(2)(f). A petition along these lines could also be filed in the Utah courts in a proceeding like this one.[16]

---

such behavior. On that matter Colorado law would apply, for reasons noted above.

[16] The concurrence rejects this approach on policy grounds, asserting that it yields "inadequate protection for Utah citizens who have been impregnated by sexual abuse in other states." *Infra* ¶ 78. Specifically, the concurring opinion complains that some states "have no statutes restricting paternal rights of fathers who conceive children through rape," while also insisting that of the states that do have such laws, "many provide less protection for rape survivors than is needed." *Infra* ¶ 79. The question presented, however, concerns the proper interpretation of the relevant statutes—of Utah Code section 78B-6-111 and of section 19-5-105.5(3) of the Colorado Code. And in this statutory realm, it is not our role to make policy. We must instead implement the policies reflected in the governing statutes as we understand them.

The concurrence sees the applicable Colorado provision as inadequate—even as supplemented by governing Utah laws. *Infra* ¶ 78 (contesting the wisdom of Colorado's requirement of a rape conviction, by warning that a rape victim would be "defenseless" if there is no conviction due to "police mistakes" or an "understaffed prosecutor's office"); ¶ 79 (asserting that Utah law providing for termination of parental rights upon a showing of unfitness is "inadequate because it underestimates the harm done when a sexual abuser is permitted even to intervene in adoption proceedings"). But these are questions for the respective legislatures. Colorado could consider amending its statute to address the concern highlighted by the concurrence. And the same goes for our Utah legislature: Subject to the limitations of the constitution, the Utah legislature could

(Continued)

¶51 Second, we do not foreclose challenges to Nevares's parental rights that were not presented for our decision on this appeal. Our conclusion is simply that the grounds advanced by respondents are insufficient as a matter of law to foreclose Nevares's right to grant or withhold his consent to an adoption under Utah Code section 78B-6-122(1)(c). In remanding, we resolve no other issues, and express no view as to any other grounds that respondents may advance in response to Nevares's petition or that may arise in any subsequent proceedings regarding the adoption of the child in question.[17]

---

consider amending section 111. Unless and until that happens, we are bound by the terms of these statutes.

The concurrence's discomfort with our holding is premised on the belief that the legislature's ability to protect mothers and children "should not depend on the laws of other states." *Infra* ¶ 81. But that prospect is not our doing. It is an inevitable feature of our federal system. And it is likewise inherent in the concurring opinion's approach. Under the concurrence, section 111's constitutionality would depend on whether Nevares's conduct was criminal in Colorado. *Infra* ¶ 76. Yet that analysis, of course, also hinges on "the laws of other states," as each state classifies criminal conduct differently. Colorado sets the age of consent at fifteen. COLO. REV. STAT. § 18-3-405(1). And because M.L.S. was fifteen at the time of her relationship with Nevares, that relationship was not illegal. But other states set a higher age of consent. Pennsylvania, for instance, sets it at sixteen. 18 PA. CONS. STAT. § 3122.1. Thus, if Nevares had been a Pennsylvanian, the concurrence would come out the other way, despite *no difference* in the nature of the relationship. *See Brooks v. A.S. (In re J.M.S.)*, 2015 UT __, ¶ 34, __ P.3d __ (Durham, J., dissenting). Thus, the legislature's ability to protect mothers and children will "depend on the laws of other states" under both approaches, and that prospect is accordingly no basis for rejecting our opinion.

[17] *See, e.g.,* UTAH CODE § 78B-6-133(1) (calling for assessment of "whether proper grounds exist for the termination of . . . [parental] rights" of a person "whose consent for an adoption is required"); *id.* § 78B-6-133(2)(b), (3) (if parental rights are not terminated, calling for "an evidentiary hearing to determine who should have custody of the child" based on "the child's best interest," and considering "evidence of psychological or emotional bonds that the child has formed with a third person, including the prospective adoptive

(Continued)

¶52    Finally, we also highlight an important implication of our decision for adoptions in cases where an unwed father did not know and could not reasonably have known of a qualifying circumstance under Utah Code section 122(1)(c)(i). The implication emanates from such a father's statutory right to assert his parental rights even afterthe mother confers her consent under Utah Code § 78B-6-122(1)(c). In light of that right, an adoption that is otherwise final may nonetheless be subject to an unwed father appearing later to assert his parental rights in a child placed for adoption. To forestall that eventuality, the mother and the adoption agency may be well-advised to inform the unwed father of the mother's qualifying circumstances. That proactive step is not legally required, but as this case indicates, it could still be advisable if the goal is to minimize the risk of an unwed father stepping forward at a later date.

—————————

parent," and "any detriment that a change in custody may cause the child"); *id.* § 78B-6-133(5) (noting that a "custody order entered pursuant to this section may . . . (a) include provisions for: (i) parent-time; or (ii) visitation by an interested third party; and (b) provide for the financial support of the child").

JUSTICE DURHAM, concurring in the result:

¶53 I concur in the result the majority reaches, and I also concur with the reasoning in Part II.A of its opinion. I disagree, however, with the majority's reasoning in Part II.B. Utah Code section 78B-6-111 does not limit its application to sexual conduct that occurred in Utah or between Utahns; rather, it applies to all fathers whose paternal rights are based on sexual conduct that would be illegal if it occurred in Utah. It therefore applies to Mr. Nevares.

¶54 However, although Mr. Nevares's sexual conduct with M.L.S. would constitute a felony under Utah law, it was legal where it occurred. Because Mr. Nevares did not commit a crime by conceiving a child with M.L.S., he has a constitutionally protected right to participate in the child's upbringing that can only be foreclosed if he fails to assert it or if he is unfit to be a parent. For this reason, I would hold that section 111 is unconstitutional as applied to Mr. Nevares as a matter of substantive due process.

## I. SECTION 111 APPLIES TO SEXUAL CONDUCT OUTSIDE OF UTAH

¶55 Utah Code section 78B-6-111 provides as follows:

> [T]he consent of a biological father [is not] required in connection with an adoption proceeding, in cases where it is shown that the child who is the subject of the proceeding was conceived as a result of conduct which would constitute any sexual offense described in Title 76, Chapter 5, Part 4, regardless of whether the biological father is formally charged with or convicted of a criminal offense.

The application of this statute to Mr. Nevares thus depends on a single question: "would [Mr. Nevares's conduct] constitute any sexual offense described in Title 76, Chapter 5, Part 4"?

¶56 Turning to Title 76, Chapter 5, Part 4, I find a sexual offense titled "unlawful sexual activity with a minor." The statute "describe[s]" this offense quite straightforwardly:

> A person commits unlawful sexual activity with a minor if, under circumstances not amounting to [a more serious sexual crime], the actor:
>
> (a) has sexual intercourse with the minor . . . .

UTAH CODE § 76-5-401(2). The statute defines "minor" as "a person who is 14 years of age or older, but younger than 16 years of age." *Id.* § 76-5-401(1).

¶57   Five years ago, M.L.S. was fifteen, and Mr. Nevares had sexual intercourse with her. Having sex with a fifteen-year-old "constitute[s]" unlawful sexual activity with a minor. Therefore, under section 111, Mr. Nevares's consent is not "required in connection with [this] adoption proceeding." *Id.* § 78B-6-111.

## A. Canons of Construction

¶58   The above plain-language reading of the statute is simple, clear, faithful to the text, not absurd, and fully consistent with the express purposes of the Utah Adoption Act. *See id.* § 78B-6-102. It is simply the best reading of the statute, and I have no doubt that, insofar as the legislature considered this issue at all, my reading is the one it intended.

¶59 The majority disagrees. I cannot call it irrational for doing so. I acknowledge that section 111 does not explicitly state that the location of the father's conduct is irrelevant. I also acknowledge that the statute's subjunctive phrasing—"conduct which *would* constitute"—is less than perfectly clear, though I do not see any plausible interpretation of that phrasing that supports the majority's conclusions.

¶60  Ultimately, the majority and I agree on the outer boundaries of what the statute might mean. We agree that, at a minimum, a father's conduct must satisfy the elements a sexual offense—both *actus reus* and *mens rea*—for section 111 to apply. On the other extreme, we agree that a father does not need to be convicted of a sexual offense for section 111 to apply. Our dispute concerns whether the statute requires something more than the elements of the offense, but less than actual prosecution and conviction. The majority insists that it does, and it defends this position with a whole battery of canons: *expressio unius*, the canon against extraterritorial effect, and the constitutional avoidance canon. I find none of them persuasive.

¶61   I find the *expressio unius* argument unpersuasive simply because *expressio unius* is an unpersuasive canon.[1] In fact, it is a

---

[1] "Far from being a rule, [*expressio unius*] is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context." BLACK'S LAW DICTIONARY 661–62 (9th ed. 2009) (quoting

(Continued)

formal propositional fallacy,[2] and its forensic weakness is on full display here. In the majority's hands, *expressio unius* turns a clause saying "prosecution and conviction are not required" into a clause saying "everything short of prosecution and conviction *is* required." *See supra* ¶¶ 30–34. These two clauses are neither logically nor legally equivalent, and there is no reason to presume that a legislature that enacted the one also intended to enact the other.

¶62 The presumption against extraterritorial effect is a stronger argument, as applying section 111 would indisputably attach legal consequences to Mr. Nevares's conduct outside Utah. And if this were the first time the effect of the Utah Adoption Act on out-of-state fathers had come into question, I would seriously consider the notion that the Act should be read in light of the background principle of law expressed by this canon.

¶63 That said, however, this canon is not constitutionally required but merely a guide to the legislature's intent, and I see no reason to imagine that the legislature intended us to apply a clear statement rule to determine the Adoption Act's extraterritorial application. Why should it have? We have never applied a "clear statement of extraterritoriality" requirement to its statutes before, and we have certainly never done so in an adoption case. To do so now, after the Adoption Act's substantial history of interpretation and amendment, would be like a child deciding in the middle of his chores that if his mother had really wanted him to take out the trash, she would have said, "Simon says."

¶64 Reading the Utah Adoption Act as a whole, I find it clear that (1) the legislature understands the Act to apply to out-of-state fathers whose children are adopted in Utah, (2) that it is aware that the Act's application to such fathers gives rise to due process problems, and (3) that in order to avoid these due process problems, while still pursuing its goal of speed and finality in adoptions, it has exempted some out-of-state fathers (not all) from some of the Adoption Act's provisions (but not all). These exemptions do not include an exemption from section 111, and to create one would violate one of

REED DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES 234–35 (1975)).

[2] Under *expressio unius*, "if *A*, then *B*" implies "if not *A* then not *B*." Logicians refer to this fallacy as "denying the antecedent." To be sure, outside the realm of formal logic, there are contexts in which "if *A* then *B*" is strong evidence for "if not *A* then not *B*," but I see no reason to believe this is one of those contexts.

the majority's own canons: the canon against reading limitations into a statute that are not apparent on the statute's face. We should not upset the compromises the legislature has reached on this issue unless they are actually unconstitutional.

¶65  Thus, leaving constitutional issues aside for a moment, section 111 has a single best reading: its application does not require anything more than that a father's conduct satisfies the elements of a sexual offense under Utah's substantive criminal law. It does not incorporate any of the procedural law that would apply if Utah attempted to prosecute Mr. Nevares, and the procedural law that it does not incorporate includes the law governing Utah's criminal jurisdiction.[3] The text of Utah's jurisdictional statute further supports this conclusion: it does not purport to establish jurisdiction as an element of every offense or to limit, in some abstract way, the applicability of Utah law to conduct in other states. Rather, it merely defines the class of persons who are "subject to prosecution" in Utah. UTAH CODE § 76-1-201(1).

### B. Constitutional Avoidance

¶66  I am persuaded that the real reason for the majority's decision is the constitutional avoidance canon. And again, I cannot call the majority's decision irrational. The procedural due process issue that concerns the majority was raised only in the last pages of Mr. Nevares's reply brief, and the respondents have had no opportunity to refute it in writing. Even if I shared the majority's constitutional concerns about section 111, I would certainly hesitate to invalidate it on the basis of such minimal argument.

¶67  Nevertheless, I think the majority's constitutional concerns are misplaced. That is not to say that section 111 can constitutionally apply to Mr. Nevares—it cannot, *see infra* Part II—but that the

---

[3] The majority claims that, in the relevant sense, "jurisdiction is substantive, not procedural" because it must be proven by the prosecution in order for the prosecution to obtain a conviction. *Supra* ¶ 32 n.4. If the majority means that the prosecution must always present evidence of jurisdiction to the jury in order to obtain a conviction, it is incorrect: the Utah Code establishes that "[i]f no jurisdictional issue is raised, the pleadings are sufficient to establish jurisdiction." *See* UTAH CODE § 76-1-201(5)(a). Jurisdiction is clearly a matter of procedure—no part of a substantive criminal offense could be presumed satisfied based merely on the pleadings.

majority is wrong about the reasons for its unconstitutionality in this case and about the scope of the constitutional problem.

¶68 By my reading, the majority's constitutional analysis is based less on any relevant precedent than on two broad principles of due process law: that Utah may not punish Mr. Nevares for conduct lacking "a significant nexus" with our state, and that section 111 should not apply to Mr. Nevares because he had no notice of it when he had sex with M.L.S. Neither of these principles is groundless, but I believe the majority misapplies them. If it did not, I would not believe they were relevant to this case.

¶69 As to the majority's "significant nexus" principle, I agree that Utah "[must] demonstrate that there exists a sufficient nexus between the conduct condemned and [the state of Utah] such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant." *Supra* ¶ 40 (first alteration in original) (quoting *United States v. Medjuck*, 156 F.3d 916, 918 (9th Cir. 1998)). But this is not a criminal case, and Mr. Nevares is not a "defendant." Rather, because Utah has jurisdiction over the child to be adopted, its law governs the adoption, regardless of whether the parties with interests at stake have ever heard of Utah. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 289 (1971) ("A court applies its own local law in determining whether to grant an adoption.").

¶70 As to the majority's "notice" principle, I agree that a person cannot be held criminally liable for conduct unless she has notice that the conduct is criminal, and this is among the reasons why section 111 cannot constitutionally apply to Mr. Nevares. *See infra* Part II. But a different father, whose sexual conduct was criminal where it occurred, would not be able to avoid section 111 by showing he lacked notice of it. Notice of the conduct's criminality would be necessary, but perfect notice of the conduct's consequences would not.

¶71 If this were not the case, then (for example) a statute establishing a sex offender registry could not apply to someone who committed his sexual offense before it was enacted, or to someone who committed his offense in a jurisdiction without such a law. The same would be true of laws prohibiting felons from carrying weapons or from voting. In each of these cases, the law attaches consequences to people's actions even though they had no notice of

the law when they acted. And yet, in each of these cases, due process allows courts to enforce the consequences.[4]

¶72   Ultimately, my disagreement with the majority on these points boils down to a difference of opinion over the purpose and effect of section 111. The majority sees section 111 as a "law regulating sexual activity" that "impos[es] a substantial penalty aimed at disincentivizing such activity." *Supra* ¶ 45. It is no such thing. The legislature has made the purposes of the Utah Adoption Act quite clear, *see* UTAH CODE § 78B-6-102, and those purposes do not include regulating, penalizing, or disincentivizing sexual conduct. Rather, they have primarily to do with the best interests of the child, with the finality of adoptions, and with balancing "the rights and interests of all parties affected by an adoption proceeding." *Id.* § 78B-6-102(3).

¶73   Read in this light, section 111 is not a penal statute at all. Rather, it is a statutory enactment of the constitutional principle the Seventh Circuit applied in *Peña v. Mattox*: that criminal conduct does not give rise to legal rights, and that a man who becomes the biological father of a child through criminal conduct does not thereby gain a right to a relationship with the child. 84 F.3d 894, 900 (7th Cir. 1996). Section 111 does not purport to deprive Mr. Nevares of rights he already possesses, the way a penal statute might deprive him of liberty or property. Rather, section 111 denies that Mr. Nevares has any rights at all in this context, the way our property law might deny that he owns a particular house. And had Mr. Nevares actually committed a crime by conceiving a child with M.L.S., this denial would be perfectly constitutional.

## II. SECTION 111 IS UNCONSTITUTIONAL AS APPLIED TO MR. NEVARES

¶74   Ultimately, the reason section 111 cannot constitutionally be applied to Mr. Nevares is much simpler than the very abstract principles the majority appeals to. In a sentence: substantive due process gives Mr. Nevares a constitutionally protected right to

---

[4] I do not mean here to endorse a general principle that legislatures may attach whatever consequences they wish to criminal conduct, without notice, so long as there is notice that the conduct is criminal. But the opposite general principle—that legislatures may never attach civil consequences to criminal conduct without giving advance notice of those specific consequences—is clearly false, and it is this general principle on which the majority's reasoning depends.

participate in his child's upbringing, and Utah may only extinguish that right if Mr. Nevares fails to assert it, or if he is unable or unfit to exercise it.

¶75 Although the precise boundaries of unmarried fathers' due process rights are much disputed, those boundaries do not concern us here. Section 111, correctly interpreted, would allow Mr. Nevares no rights whatsoever with respect to the adoption of his child. If Mr. Nevares had actually committed a crime by having sexual relations with M.L.S., rather than merely engaging in "conduct which would constitute" a sexual offense in Utah, Utah Code § 78B-6-111, then this denial of rights would be perfectly constitutional. "[N]o court has gone so far as to hold that the mere fact of fatherhood, consequent upon a criminal act . . . [and] not cemented . . . by association with the child, creates an interest that the Constitution protects in the name of liberty." *Peña v. Mattox*, 84 F.3d 894, 900 (7th Cir. 1996); *see also In re J.M.S.*, 2015 UT ___, ¶¶ 32–38, ___ P.3d ___ (Durham, J., dissenting).

¶76 But Mr. Nevares's conduct cannot be considered a crime because, though prohibited by Utah, it was legal where it occurred. The present case is therefore governed by a doctrine the U.S. Supreme Court applied in *Quilloin v. Walcott*: the state may not terminate an unwed father's rights in his child "without some showing of unfitness," 434 U.S. 246, 255 (1978), unless the father has had an opportunity to assert those rights and has failed to do so, *see id.* at 255–56. Mr. Nevares has not slept on his rights, and he has not been determined unfit. He must therefore be allowed to contest the adoption.

## III. UTAH LAW SHOULD APPLY

¶77 The majority seeks to soften the effect of its decision by allowing the victims of sexual abuse to contest their abusers' paternal rights using the laws of the states where they were abused. *Supra* ¶¶ 48–49. It also points out that such an abuser's paternal rights could potentially be terminated upon a showing that he was unfit for parenthood. *Supra* ¶ 50.

¶78 This is better than nothing, I suppose, even if the basis for applying Colorado law is weak. But it is ultimately inadequate protection for Utah citizens who have been impregnated by sexual abuse in other states.

¶79 To begin with, it is inadequate because not all states have laws like Colorado's. Nineteen states and the District of Columbia have no statutes restricting the paternal rights of fathers who conceive children through rape. Moriah Silver, *The Second Rape: Legal Options for Rape Survivors to Terminate Parental Rights*, 48 FAM. L.Q. 515, 526–

27 (2014). Of the thirty-one states that do, many provide less protection for rape survivors than is needed—in particular, many states (like Colorado) require the father to be convicted of sexual assault before a court may cut off his paternal rights. *Id.* at 529–31. In such states, the ability of a rape victim to protect her child from her rapist depends on the willingness and ability of police and prosecutors to secure a conviction. If police mistakes lead to the exclusion of vital evidence, or an understaffed prosecutor's office offers a lenient plea bargain, she is left defenseless.

¶80  To deal with situations where laws protecting victims are inadequate or absent, the majority points to a failsafe: a court's ability to terminate a father's rights upon a showing of unfitness for parenthood. *Supra* ¶ 47. Beyond its optimistic assumption that rapist fathers will easily be found unfit, this failsafe is inadequate because it underestimates the harm done when a sexual abuser is permitted even to intervene in adoption proceedings. The ability to hold up the adoption, with the threat that he might block it entirely, gives the abuser powerful leverage to extract concessions from his victim. At the least, it allows him to force his victim into repeated contact with him so long as litigation continues.

¶81  The legislature, perceiving these problems, drew a bright line: no father who has conceived a child through sexual assault may contest that child's adoption, regardless of whether he is fit for parenthood, and regardless of whether his guilt can be established under the stricter procedures and higher burden of proof of a criminal trial. *See* UTAH CODE § 78B-6-111. Moreover, the legislature has every right to draw this line, at least where the child and its mother are citizens of Utah whom the state has a responsibility to protect. Its ability to protect them should not depend on the laws of other states.

## IV. CONCLUSION

¶82  Because the majority has grave constitutional concerns, it turns a statute applying to "conduct that would constitute an offense in Utah" into a statute applying only to conduct that "could . . . sustain[] a criminal charge" in Utah. *Supra* ¶ 28. In order to do so, it turns a clause stating that section 111 does not require formal prosecution and conviction into a clause stating that section 111 requires everything but formal prosecution and conviction. Further, it pretends that the legislature assumed we would apply a canon that we nearly never apply.

¶83  But for all that, I acknowledge the wisdom of the majority's decision to apply the constitutional avoidance canon in this case rather than decide the constitutional issues it finds so worrying.

JUSTICE DURHAM, concurring in the result

True, its worries are unnecessary, as a clear and straightforward answer is available: substantive due process clearly protects Mr. Nevares from section 111, while no constitutional doctrine at all protects a father whose paternal rights result rest entirely from on a sex crime. But I nevertheless applaud the majority for penciling its concerns into a state statute, where the legislature can erase them if it desires, instead of chiseling them in federal constitutional stone.

¶84  When this issue returns to us, as I suspect it will, I hope the court will keep in mind Part III of my opinion above. Utah has compelling reasons to protect its citizens who have been victims of sexual abuse, regardless of where they were abused. An interpretation of the Due Process Clause under which this compelling interest must always bow to rapists' right to "notice"—that is, their imaginary right to know before they commit rape whether they will be able to raise the resulting offspring—is, to put it mildly, unlikely to be correct.

———————