*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2015 UT 67**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of B.Y., a minor child.

JAKE STRICKLAND,

*Appellant.*

No. 21030088
Filed August 11, 2015

Second District, Farmington
The Honorable David R. Hamilton
No. 112700011

Attorneys:
Wesley D. Hutchins, West Jordan, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, JUSTICE PARRISH, and JUDGE BLANCH joined.

JUSTICE NEHRING, due to his retirement, did not participate; DISTRICT JUDGE JAMES A. BLANCH sat.

JUSTICE HIMONAS became a member of the Court on February 13, 2015, after oral argument in this matter, and accordingly did not participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    This is an appeal from the denial of a motion to intervene in an adoption proceeding. The motion was filed by Jake Strickland, the putative father of the child in question. The district court denied the motion on the ground that Strickland had failed to

strictly comply with the statutory requirements in the Adoption Act for an unmarried putative father to preserve his right to contest an adoption.

¶2   In so doing, the district court also rejected Strickland's attempt to excuse his failure to fulfill the requirements of the Act based on representations made to him by the mother—specifically, her promise not to place the child for adoption if Strickland agreed not to file a paternity action. The court's rejection of Strickland's reliance on the mother's representations was based on a provision of the Adoption Act providing that a parent of a child conceived outside of marriage "is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties." UTAH CODE § 78B-6-106(1). Strickland also challenged the constitutionality of this provision on various grounds rejected by the district court.

¶3   We affirm. Strickland forfeited his parental rights as a result of a private bargain he struck with W.P., not because of any unconstitutional or otherwise unlawful state action. We accordingly hold that Strickland has no viable interest in the child in question and therefore affirm the denial of his motion to intervene.

I

¶4   In early 2010, Strickland was involved in a sexual relationship with W.P. At that time, W.P. was married to someone else. She and Strickland were not then married and have never been married.

¶5   W.P. informed Strickland that she was pregnant in April 2010. She also told him that he was the father. The two of them remained in substantial contact throughout the pregnancy.

¶6   By August, W.P. had decided, at least tentatively, to place the child for adoption. Strickland strongly protested. W.P. proposed a deal: If Strickland "promised to never leave and would help with anything that [B.Y.] needed or wanted," the two of them "could raise him together and jointly share custody and costs for him." Strickland agreed.

¶7   Despite this agreement, Strickland contacted an attorney to determine what he needed to do to protect his parental rights. The

attorney advised him to file a paternity action—one of several requirements in the Adoption Act for an unmarried father to protect his right to object to an adoption. *See* UTAH CODE § 78B-6-121(3). But before filing, Strickland told W.P. what he intended to do. W.P. got upset and threatened to proceed with the adoption if he filed the action. Strickland caved in to her demands. He promised not to file "as long as [she] promise[d] not to go for adoption and not tell [him]." And, true to his word (but unfortunately for him), Strickland never filed.

¶8 Contrary to their agreement, and without telling Strickland, W.P. continued to make arrangements to place the child for adoption.[1] The child, B.Y., was born on December 29. The next day, W.P. relinquished her parental rights and placed the child for adoption through LDS Family Services. As required by Utah law, LDS Family Services then searched the records at Utah's Office of Vital Records and Statistics and determined that, as of January 4, 2011, no paternity action had been filed. LDS Family Services proceeded with the adoption.

¶9 The record on these points is clear: W.P. represented to Strickland that she would not place B.Y. for adoption, and Strickland believed her. Between the date of B.Y.'s birth and LDS Family Services' record search, Strickland asked W.P. multiple times about the pregnancy, expressing excitement at the prospect of raising his child. On each occasion, W.P. either dodged his questions or misled him.[2]

¶10 When W.P. finally broke the news to Strickland, he promptly commenced a paternity action. Later, Strickland also moved to intervene in the pending adoption proceeding. In sup-

---

[1] As the record indicates, placing B.Y. for adoption was not a last-minute decision. W.P.'s ex-husband, K.R., signed a form relinquishing his parental rights and consenting to adoption on December 21, 2010, more than a week before the birth, and more than two weeks before W.P.'s predicted due date.

[2] For example, when Strickland asked, through a text message, if "we [are] havin' a baby yet," W.P. did not respond. And when Strickland asked W.P. how her doctor appointment went, W.P. said "good no change" even though she had already had the baby.

port of his motion, Strickland raised various federal and state constitutional challenges to the Adoption Act. Strickland also filed a motion for limited discovery and a motion to disqualify opposing counsel, based on allegations that the adoptive parents' attorney withheld material information about the adoption from the court.

¶11 The district court rejected Strickland's constitutional challenges and ruled that Strickland had "no interest in the adoption proceeding" because he failed to strictly comply with the statutory requirements for contesting B.Y.'s adoption. In support of this conclusion, the court stated that "fraudulent representation is not . . . an excuse for failure to strictly comply," citing Utah Code section 78B-6-106. The district court also rejected Strickland's motion for discovery and to disqualify counsel on the ground that he did "not have standing to intervene."

¶12 Following the district court's ruling on his motion to intervene, Strickland filed this appeal. Our review of the district court's ruling on the legal questions presented on Strickland's motion to intervene is de novo. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382.

II

¶13 To preserve his right to object to an adoption of his biological child, Strickland was required to file, among other things, a paternity petition. UTAH CODE § 78B-6-121(3)(c). He admittedly failed to do so. To excuse his failure, Strickland points to the assurances given by W.P. that she would not place B.Y. for adoption if he would agree not to assert his parental rights by filing a paternity action. And because W.P.'s representations to Strickland were later shown to be false when given, Strickland asserts his reliance on those representations as a basis for excusing his failure to comply with the terms of the Adoption Act.

¶14 The threshold problem with Strickland's position is that it is incompatible with the express terms of the Adoption Act. The governing provision provides as follows:

> (1) Each parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties.

4

> (2) Any person injured by fraudulent representa-
> tions or actions in connection with an adoption is en-
> titled to pursue civil or criminal penalties in accord-
> ance with existing law. A fraudulent representation
> is not a defense to strict compliance with the re-
> quirements of this chapter . . . .

UTAH CODE § 78B-6-106(1)–(2).

¶15 Strickland's response to this provision is a challenge to its constitutionality. He claims that the Adoption Act's requirement of strict compliance even in the face of W.P.'s false representations infringes his rights on various constitutional fronts—procedural and substantive due process, equal protection, the Fifth Amendment right against self-incrimination, and the Open Courts Clause of the Utah Constitution. In addition, Strickland also challenges section 106 under the Supremacy Clause, asserting that it is preempted by the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A. Finally, Strickland challenges the district court's denial of his motions for discovery and to disqualify opposing counsel. We reject each claim on grounds set forth below.

## A. Procedural Due Process

¶16 Strickland's first claim sounds in procedural due process. At its core, the due process guarantee is twofold—reasonable notice and an opportunity to be heard. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993); *Daily Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581. Yet the promise of the Due Process Clause is limited. It is a protection against state action—not a charter aimed at regulating the actions of private parties. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349–50 (1974).

¶17 This distinction is of particular relevance in this case. To some extent, Strickland's concerns about his lack of notice and an opportunity to be heard stem from private activity—from W.P.'s misrepresentations and his omissions in reliance thereon. On the notice claim in particular, we conclude that there is no state action and thus no viable due process claim. On the opportunity to be heard claim, on the other hand, there is an element of state action—in the provision of the Utah Adoption Act defining the terms and conditions of an unwed father's right to participate or object to an adoption. *See* UTAH CODE § 78B-6-121(3). We affirm the dismissal of this claim on the merits, concluding that the stat-

ute in question affords to Strickland the meaningful opportunity to be heard guaranteed by due process.

### 1. Notice

¶18  A fundamental guarantee of due process is the right to notice. Before a right of property or other important interest is foreclosed as a result of state action, reasonable notice must be afforded. *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976). And Strickland claims that he was deprived of such notice in this case.

¶19  Yet, to the extent Strickland's notice argument centers on W.P.'s misrepresentations, it fails at the "state action" threshold. Strickland is not complaining about the *government's* failure to provide notice of his obligation to file a paternity action. Nor could he. *See Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 755 (Utah 1984) (holding that there is no "constitutional requirement" under the Due Process Clause that the state "give actual notice of the statutory requirements for establishing parental rights"). And to the extent he is arguing that he did not have adequate notice of the Adoption Act's requirements, his argument also fails. As a Utahn he had constructive notice of the content and applicability of the terms of Utah law.[3] And in this case, in any event, Strickland also had actual notice, as the lawyer he consulted told him that Utah law required him to file a paternity action.

¶20  As briefed, it appears that Strickland's ultimate gripe is not with the government but with W.P. He claims that W.P.'s misrepresentations effectively "stripped" him of the notice he was given of his obligations under Utah law. But the due process guarantee is notice from the government, not from private parties. And the state afforded Strickland with all the notice he was due.[4] To the

---

[3] *See Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014) (citing the "well-known maxim, 'Ignorance of the law is no excuse'"); *Cary v. Curtis*, 44 U.S. 236, 252 (1845) (noting that "all must be presumed to possess" "notice of the law"); *People v. Monk*, 28 P. 1115, 1116 (Utah Terr. 1892) ("[I]n general every person is presumed to know the law of the country in which he lives.").

[4] *See Steve B.D. v. Swan (In re Steve B.D.)*, 730 P.2d 942, 947 (Idaho 1986) (per curiam) (asserting, in the context of rejecting a father's due process claim that the mother's fraud caused him to lose his parental rights, that "the critical fact remains that the opportunity

extent he was talked out of relying on that notice by W.P., his recourse is through a civil claim sounding in fraud or misrepresentation. *See* UTAH CODE § 78B-6-106(2) (recognizing that a "person injured by fraudulent representations or actions in connection with an adoption is entitled to pursue civil or criminal penalties in accordance with existing law," while providing that a "fraudulent representation is not a defense to strict compliance with the requirements of this chapter").

¶21 We said nothing to the contrary in *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, 308 P.3d 382. Strickland reads that decision as establishing a father's right to actual knowledge of the applicability of Utah law *unimpeded by private conduct*. But the *Baby B.* opinion says nothing of the sort. For one thing *Baby B.* isn't about the requirements of due process. The portion of the opinion cited by Strickland concerns the interpretation of Utah Code section 78B-6-121(3)—a provision authorizing an adoption without a putative father's consent if he knew or could have known of a "qualifying circumstance" and failed to follow the dictates of Utah law. *See In re Baby B.*, 2012 UT 35, ¶ 37. And in *Baby B.* we simply held that *mere belief* was insufficient under this provision. *Id.* ¶ 53–55. That conclusion had nothing to do with the notice required by the Due Process Clause.

¶22 In this case, moreover, there is no question of Strickland's knowledge of qualifying circumstances under section 122(1)(c)(i)(A). Strickland had ample knowledge of such circumstances—that W.P. resided in Utah, UTAH CODE § 78B-6-122(1)(a)(i), and that she planned to give birth here, *id.* § 78B-6-

---

to assert his interest slipped away without any involvement of the state"); *Friehe v. Schaad*, 545 N.W.2d 740, 748 (Neb. 1996) (rejecting a father's due process claim where he relied on the mother's promise not to relinquish the child because "[h]is own failure to act upon the notice given to him deprived him of the opportunity to be heard"); *In re Baby Boy K.*, 546 N.W.2d 86, 101 (S.D. 1996) (rejecting a father's due process claim where the mother concealed her pregnancy from the father and the identity of the father from the court because the "[m]other's alleged dishonesty was a private act in which the State was also deceived" and the father "cannot claim illegal state action where the State was itself a victim rather than a perpetrator").

122(1)(a)(ii). And, as noted above, he had both constructive and actual notice of the consequence of his failure to file a paternity action as dictated by Utah law. Due process required no more notice than that. Certainly it didn't entitle Strickland to rely on W.P.'s representation as to her intentions not to hold him to the dictates of our law. W.P. had no legal authority to excuse Strickland from the terms of our adoption laws, which are aimed not just at protecting the birth mother (W.P.) but also other parties unrepresented by her—most importantly the child, and also its adoptive parents.

### 2. Opportunity to be heard

¶23 Mere notice is an empty gesture if it is not accompanied by a meaningful chance to make your case. So the Due Process Clause also guarantees such a chance—"an opportunity to be heard at a meaningful time and in a meaningful manner." *Gray v. Netherland*, 518 U.S. 152, 182 (1996) (internal quotation marks omitted).

¶24 Strickland claims that he has been deprived of that opportunity. He alleges that his opportunity to appear and assert his parental rights in the adoption of B.Y. was foreclosed in a manner infringing his right to due process.

¶25 In analyzing this claim, we begin again with the state action question. On this claim, as noted above, there is at least an allegation of state action. Although Strickland concedes that it was W.P.'s representations that led to his failure to file a paternity claim, he also points to a state statute, Utah Code section 78B-6-106, as the subject of his claim. That statute provides that "strict compliance" with the Adoption Act is "not excused . . . based upon any action, statement, or omission of the other parent or third parties." And Strickland seeks to cast his due process claim in terms that challenge that provision—asserting that the statute effectively endorsed the effectiveness of W.P.'s representations, and that the statute thus deprived him of a meaningful opportunity to assert his parental rights. We find no merit in that claim and affirm its dismissal under the standards and precedents described below.

¶26 The due process right to an *opportunity* to be heard is by no means a blanket prohibition of procedural prerequisites to the preservation of a legal right. *See Bolden v. Does (In re Adoption of*

*J.S.)*, 2014 UT 51, ¶ 21, __ P.3d. __. As we explained in *Bolden*, our law leaves ample room for such procedural prerequisites. "A statute of limitations . . . may foreclose a cause of action before it is ever litigated on its merits," and a "procedural bar" may impose a "similar effect." *Id.*; *see also Logan v. Zimmerman Brush, Co.*, 455 U.S. 422, 437 (1982) ("The State may erect reasonable procedural requirements . . . [such as] statutes of limitations . . . . And the State certainly accords *due* process when it terminates a claim for failure to comply with a reasonable procedural . . . rule.").

¶27 That is not to say that such procedural prerequisites are immune from due process scrutiny. "Applicable standards of procedural due process do not yield free-wheeling authority for the courts to second-guess the wisdom or fairness of legislative policy judgments" in this arena. *Bolden*, 2014 UT 51, ¶ 23 n.9. But they do leave room for a due process challenge where a procedural bar can be shown to "foreclose[] . . . meaningful access to the justice system." *Id.* ¶ 23.[5]

¶28 In past cases, we have found this standard to be met by a showing of *impossibility*. In *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-day Saints*, 615 P.2d 1250 (Utah 1980), for example, we upheld a procedural due process challenge to the requirements of our Adoption Act by a putative father whose compliance with the law was shown to have been rendered "impossible" "through no fault of his own." *Id.* at 1256. The facts of *Ellis* help to elucidate this standard. In that case the child in question was conceived in a relationship between two California residents who were engaged to be married prior to the child's birth. *Id.* at 1252. About two weeks before the wedding, however, the mother broke off the engagement. *Id.* Then, a few days before the child's birth, she traveled from California to Utah without the father's knowledge. *Id.* And ultimately, upon arriving in Utah, she placed the child for adoption—after representing to those involved that the father was unknown. *Id.*

---

[5] *See also Logan v. Zimmerman Brush, Co.*, 455 U.S. 422, 433–34 (1982) ("[T]he state may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement.").

¶29  In finding a due process problem in *Ellis*, we noted that the putative father "was not given an opportunity to present evidence to show as a factual matter that he could not reasonably have expected his baby to be born in Utah." *Id.* at 1256. And because due process requires a "reasonable opportunity to comply" with the statutory prerequisites to the establishment of a parental right, we found a due process problem in that circumstance. *Id.* In so concluding, we first noted the "usual case," in which "the putative father would either know or reasonably should know approximately when and where his child was born." *Id.* Yet we also distinguished the facts in *Ellis* from this usual case—in that in *Ellis* it was "impossible for the father to file the required notice of paternity prior to the statutory bar, through no fault of his own." *Id.* And we held that due process was not afforded in these circumstances, given that the father in question had not been given "a reasonable opportunity to comply with the statute." *Id.*

¶30  We reinforced the *Ellis* "impossibility" standard in our subsequent opinion in *Wells v. Children's Aid Society of Utah*, 681 P.2d 199 (Utah 1984). *Wells* was the more "usual case." In *Wells* "the birth occurred in the same state as the father's residence, and neither the child's mother nor the [adoption] agency was involved in any effort to prevent him from learning of the birth." *Id.* at 207. "All the father needed to do to assert his rights was file his claim of paternity . . . any time prior to . . . the date the mother relinquished the child" for adoption. *Id.* And because the father had "ample advance notice of the expected time of birth" and "advice of counsel" that he needed to file a paternity claim to preserve his rights, we concluded that he had "sufficient opportunity" to be heard as a matter of due process. *Id.*

¶31  In so holding, we emphasized the narrowness of our earlier decision in *Ellis*. We noted, in particular, that the requirement of a "reasonable opportunity" to be heard did not require a fact-intensive, case-by-case evaluation of the reasonableness of imposing a strict compliance requirement on each putative father. *Id.* at 208. In response to the father's argument that *Ellis* had held that "due process requires that the father be allowed to show 'he was not afforded a reasonable opportunity to comply with the statute,'" our opinion in *Wells* gave a limiting construction to *Ellis*: "Such an interpretation overlooks the fact that the 'reasonable opportunity' referred to in the quoted sentence only applies 'in such

a case,' i.e., when it is first shown that it was 'impossible' for the father to file 'through no fault of his own.'" *Id.* "Otherwise," we emphasized, the requirement of a fact-intensive showing that the putative father "had a 'reasonable opportunity' to file the required notice of paternity would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status." *Id.*

¶32 In reinforcing that conclusion, we also relied on the United States Supreme Court's opinion in *Lehr v. Robertson*, 463 U.S. 248 (1983). Quoting *Lehr*, we asserted in *Wells* that "'legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously . . . also *justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute*.'" *Wells*, 681 P.2d at 208 (quoting *Lehr*, 463 U.S. at 265). And where the right to notice and an opportunity to be heard were "completely within [the putative father's] control," we held that the requirement of strict compliance was not offended. *Id.* In so doing, we again distinguished *Wells* from *Ellis*—noting that the *Ellis* holding would come into play only where "it was (1) 'impossible' for the father to make a timely filing of the required notice (2) 'through no fault of his own.'" *Id.*

¶33 The *impossibility* inquiry centers on the father's factual basis for anticipating the need to fulfill the requirements of Utah law to protect his legal rights. A father who lacks a sufficient basis can establish that he has not been given a meaningful opportunity to be heard. Under our cases, a father's due process right to be heard is infringed where his rights are foreclosed for failure to comply with the Adoption Act but he "could not reasonably have expected his baby to be born in Utah," *Ellis*, 615 P.2d at 1256, or he "did not know and could not reasonably have known that his child would be placed for adoption in Utah," *Nevares v. M.L.S.*, 2015 UT 34, ¶ 25, 345 P.3d 719.

¶34 On the other hand, a father who knows of a pregnancy and has reason to suspect that his child will be born in or placed for adoption in Utah must fulfill the requirements of the Utah Adoption Act. And such father has a "sufficient opportunity" to be heard and thus cannot establish *impossibility*. *Wells*, 681 P.2d at 207. That conclusion holds, moreover, even if he is talked out of availing himself of that opportunity by promises or representa-

tions of a private party (such as the mother).[6] *See id.* at 208 (noting that a contrary conclusion would "frustrate the statute's purpose to facilitate secure adoptions by early clarification of status"); *Bolden*, 2014 UT 51, ¶ 23 (a procedural due process challenge to a requirement of the Adoption Act fails where the putative father "failed to fulfill it not because it was difficult" but because of his reliance on private conduct—counsel's legal advice).[7]

---

[6] The due process standard described here, and recognized in our prior decisions, has been incorporated into the Adoption Act. Utah Code section 78B-6-122(c)(i)(a) protects unwed fathers who failed to comply with Utah adoption requirements when they "did not know, and through the exercise of reasonable diligence could not have known, . . . that a qualifying circumstance existed." Under this provision, a father's right to contest an adoption remains intact so long as he "fully complied" with the adoption requirements of the state whose laws he *could have* expected to apply. *See Nevares v. M.L.S.*, 2015 UT 34, ¶ 14, 345 P.3d 719. This statute identifies precisely the same problem addressed in *Ellis* and *Wells*. And it supplies a choice-of-law solution that avoids the significant due process problems that could follow from holding a father to the elements of the Utah Adoption Act where the father lacks a sufficient basis for anticipating its application.

[7] *See also Lehr v. Robertson*, 463 U.S. 248, 265 (1983) (explaining, in the course of upholding New York's adoption scheme, that "[t]he Constitution does not require . . . a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights"); *Steve B.D.*, 730 P.2d at 946 (rejecting a due process challenge to the procedural requirements of Idaho's adoption act in light of the "essential fact" is that the father "failed to initiate . . . any legal actions to establish his interest"); *In re Adoption of A.A.T.*, 196 P.3d 1180, 1199–1200 (Kan. 2008) (holding the father responsible for his failure to timely file and adding that "[r]arely, however, have the mother's actions alone been sufficient to shift the balance of interests to the point the court determined the State was not justified in [terminating his parental rights]"); *Heidbreder v. Carton*, 645 N.W.2d 355, 373 (Minn. 2002) (rejecting a father's due process challenge despite the mother's fraud when the right to contest the adoption was completely within the father's control); *Robert O. v. Russell K.*, 604 N.E.2d 99, 104

¶35 Strickland falls into this latter category, and his due process claim fails on that basis. Strickland knew of the pregnancy prior to his child's birth; in fact, he knew about it from the beginning and had about eight months to file a paternity action. Once he learned that W.P. had decided to move forward with the adoption, moreover, Strickland completed and filed the necessary documents within a single day. So Strickland surely could have fulfilled the requirements of the Adoption Act before the child was placed for adoption. He simply chose to forgo that opportunity in reliance on the representations of a private party.

¶36 The injury stemming from Strickland's reliance may sustain a private suit for damages. But it does not sustain a due process claim entitling him to intervene in an adoption. Strickland's claim is traceable not to state action but to W.P.'s private conduct. And his claim fails on its merits for that reason.

¶37 Strickland objects that this analysis is in tension with this court's decision in *In re Adoption of Baby Boy Doe*, 717 P.2d 686 (Utah 1986). And to some degree it is. In *Baby Boy Doe*, the putative father had knowledge of the mother's pregnancy and also knew that the mother was residing in Utah. *Id*. at 687. And although the father was not a Utah resident, it seems apparent that it was not "impossible" for him to comply with Utah law to protect his rights.[8] Yet the *Baby Boy Doe* court (a divided 3-2 majority) up-

_____

(N.Y. 1992) (holding that the mother's conduct did not prevent father from protecting his rights); *Napier v. Adoption Parents of Cameron*, 795 N.E.2d 707, 713 (Ohio Ct. App. 2003) (rejecting a father's due process challenge under *Lehr*); *Burns v. Crenshaw*, 733 P.2d 922, 925 (Or. Ct. App. 1987) (upholding Oregon's scheme as similar to the scheme in *Lehr*).

[8] *See id*. at 693 (Stewart, J., dissenting) (asserting that the father "must have realized that there was a reasonable likelihood" that the child would be born in Utah "long prior" to the birth, and thus that "[i]t cannot be said . . . that it was 'impossible' for [him] to protect his paternal rights"); *id*. at 690 (majority opinion) (responding only that the father was "unaware of the birth until three days after the child had been born" due to the fact that the baby had been born "one or more weeks early" and the father "was traveling between California and Arizona" and thus would have had a difficult time contacting the mother).

held the putative father's due process challenge to the strict compliance requirements of our Adoption Act. In so doing, moreover, it emphasized some points that we now deem irrelevant (because they are causally connected not to state action but to private representations).

¶38 Specifically, the *Baby Boy Doe* court asserted that the mother's representations as to her intentions to "move to Arizona" with the father "alleviated any concern [he] might otherwise have had as to his need to protect his parental rights because he had no reason to believe an adoption would be attempted." *Id.* at 690. And the majority also emphasized the putative father's "reliance on the mother's representations"—that he "traveled to Arizona, obtained employment [there], found a place to live, and moved the couple's belongings" to Arizona. *Id.* The court's holding, moreover, appears to stem in part from the circumstances surrounding the mother's misrepresentations and the putative father's reliance thereon. In concluding that the putative father had "successfully shown that the termination of his parental rights was contrary to basic notions of due process, and that he came forward within a reasonable time after the baby's birth," the *Baby Boy Doe* majority relied at least in part on the "representations made by the mother." *Id* at 691.

¶39 These considerations are insufficient to sustain a due process challenge to the strict compliance provision of the Utah Adoption Act. For reasons explained above, a putative father who knows of a pregnancy and has reason to suspect that his child will be born in or placed for adoption in Utah is on notice of the applicability of Utah Code section 78B-6-106. *Supra* ¶ 34. And because that provision clearly states that a private representation is insufficient to excuse compliance with the Adoption Act, a father who knows of a pregnancy and of a likely birth in Utah but ignores the Utah statute in reliance on a mother's representations has been given all the process that he is due. Such a father proceeds at his peril if he relies on such representations. And if those representations are not fulfilled, his recourse is in a civil suit against the mother, not in an intervention motion asking the district court to excuse his noncompliance with our adoption law.

¶40 We repudiate the elements of the *Baby Boy Doe* decision that are in conflict with our opinion in this case.[9] And we hold that Strickland's procedural due process claim fails on its merits and is not sustained by our opinion in that case.

## B. Substantive Due Process

¶41 Strickland also challenges the application of the strict compliance provision of the Adoption Act under the *substantive* component of the Due Process Clause. Such a claim is distinct from the procedural due process challenge analyzed above. "A procedural due process attack" on the statutory requirements of the Adoption Act "take[s] the form of an assertion that such a limitation forecloses any meaningful opportunity for the plaintiff to protect its rights." *Bolden*, 2014 UT 51, ¶ 22. "A substantive challenge," on the other hand, "involve[s] a broad-side attack on the fairness of the procedural bar or limitation, on the ground that the right foreclosed is so fundamental or important that it is protected from extinguishment." *Id.*

¶42 Strickland advances such a claim here. He concedes that he failed to file a paternity action as required by the Utah Adoption Act. But, citing *Lehr v. Robertson* and related federal precedent, Strickland asserts that he did enough to "grasp" his "opportunity . . . to develop a relationship with his offspring," 463 U.S. at 262, and thus insists that he perfected a fundamental parental right that was protected from extinguishment in this adoption proceeding.

---

[9] Our opinion in *Wells* also included some stray references to considerations paralleling those in *Baby Boy Doe*. *See Wells*, 681 P.2d at 207 (noting, in the course of rejecting the father's due process argument, that "neither the child's mother nor the agency was involved in any effort to prevent [the father] from learning of the birth or from asserting his parental rights"). Our analysis here also renders these considerations irrelevant as a matter of due process. And in fact, the *Wells* opinion itself suggests that these considerations are irrelevant, stating that "[t]hese [factors] exceed[ed] what is necessary" under *Ellis* and deeming the *Ellis* exception "inapplicable" based on differences in the parents' residencies in the two cases. *Id.*

¶43  This claim fails as a matter of law. An unwed father's rights are merely provisional. *See Wells*, 681 P.2d at 208 (quoting *Lehr*, 463 U.S. at 265).  To perfect such rights a father must comply with legal prerequisites established by the state. *Id*. Failure to do so leaves the father's parental rights without any substantive protection—except in the narrow circumstance in which the prerequisites established by the state are *arbitrary*. *Lehr*, 463 U.S. at 263–64.

¶44  The Due Process Clause, moreover, is not a license for courts to second-guess the prerequisites established by the legislature for a putative father to perfect his parental rights. Instead, the well-settled standard yields substantial deference to the state's chosen prerequisites. It does so in light of the state's important interest in "immediate and secure adoptions for eligible newborns." *Wells*, 681 P.2d at 203.

¶45  As we noted in *Wells*, the *Lehr* court rejected a substantive due process challenge to a New York provision requiring notice of an adoption proceeding to an unwed father "only if he had filed a notice of intent to claim paternity with the putative father registry." *Id*. at 205 (citing *Lehr*, 463 U.S. at 264). It did so on the ground that "a more open-ended notice requirement would . . . complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desired finality of adoption decrees." *Lehr*, 463 U.S. at 264. And it upheld the New York requirement of a paternity filing under a deferential standard of scrutiny—rejecting the putative father's challenge on the ground that the New York requirement was not "arbitrary." *Id*. Our cases have applied this same standard in upholding a requirement of a paternity filing under Utah law. *See Wells*, 681 P.2d at 206 (holding that acknowledgement of paternity requirement was "not 'arbitrary'" and was "therefore constitutional under the Due Process Clause of the United States Constitution").

¶46  Strickland's claim fails under this standard. He does not establish that the paternity filing requirement is "arbitrary." Nor could he. For reasons established in *Lehr* and *Wells*, the require-

ment of a paternity filing is far from arbitrary.[10] We therefore affirm.

## C. Equal Protection

¶47 Strickland next challenges the strict compliance provision under the Equal Protection Clause of the U.S. Constitution. U.S. CONST. amend. XIV, § 1 (". . . nor shall any State deprive any person . . . the equal protection the laws."). His equal protection challenge is twofold. First, Strickland contends that the statute "*does not sufficiently differentiate* between the Involved Father and the deadbeat dad." Second, he claims that legislative findings in the Adoption Act impermissibly discriminate on the basis of gender. Both claims fail as a matter of law.

¶48 The first claim is based on a faulty premise. Equal protection is a prohibition of suspect *classification* by government. *See Bolden*, 2014 UT 51, ¶ 67 (explaining that equal protection, like its state law counterpart in the Uniform Operation Clause, begins with an assessment of "what classifications, if any, the statute creates"); *State v. Canton*, 2013 UT 44, ¶ 35, 308 P.3d 517 (same). That prohibition encompasses both inherently suspect classifications, such as race, and other classifications that are "presumptively permissible, and thus subject only to 'rational basis review.'" *Canton*, 2013 UT 44, ¶ 36.

¶49 In any case, however, the equal protection inquiry focuses on the *actual classification* employed by the government. *Id*. ¶ 39. "[C]oncerns of over-inclusiveness . . . are relevant only insofar as they bear on the question whether the classification that was made clears the applicable standard of scrutiny." *Id*. They do not present a "viable, standalone basis" for an equal protection claim. *Id*. Thus, "litigants whose gripe is that the legislature has impermissibly grouped them into a category with other dissimilar individuals must demonstrate that the classification that put them there fails constitutional muster." *Id*.

---

[10] *See supra* ¶ 45 (quoting the *Lehr* court's analysis concerning why New York's adoption scheme was not arbitrary); *Wells*, 681 P.2d at 206–07 (describing the state's interests in "speedily identifying those persons who will assume a parental role over newborn . . . children," in protecting "the privacy interests of unwed mothers," and in furthering "the other interests . . . cited in *Lehr*").

¶50 Strickland's initial equal protection claim fails on that ground. He is not complaining about the rationality of the classification that was made by the legislature. He is asserting only that *further classification* would have been better. That is not a viable equal protection claim.

¶51 Strickland's second claim founders on similar grounds. The statutory "findings" he questions make no classification at all. They simply present the legislature's take on factual questions of relevance to Utah Code section 78B-6-106—that there is "no practical way to remove all risk of fraud" and that "the unmarried biological father is in the best position to prevent or ameliorate the effects of fraud and that, therefore, the burden of fraud shall be borne by him." UTAH CODE § 78B-6-102(6)(d). Because the findings provision makes no government classification, it cannot properly be the subject of any equal protection scrutiny. And the operative provision, Utah Code section 78B-6-106, is neutral on its face.

¶52 This provision, as noted above, sweeps in broad, gender-neutral terms. It provides generally that "*[e]ach parent*"—mother or father—"of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties." *Id.* § 78B-6-106(1) (emphasis added). And it states that "*[a]ny person* injured by fraudulent representations . . . is entitled to pursue civil or criminal penalties in accordance with existing law." *Id.* § 78B-6-106(2) (emphasis added). There is no sex-based classification in these provisions, and thus no basis for the equal protection claim advanced by Strickland.

¶53 At most, Strickland may be asserting that section 78B-6-106 has a disparate impact on men. But if so, his claim falters under *Washington v. Davis*, 426 U.S. 229, 243–44 (1976), which requires that "purposeful discrimination" be established to sustain a disparate impact claim under the Equal Protection Clause. *See also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273–74 (1979) (articulating the "settled rule that the Fourteenth Amendment guarantees equal laws, not equal results"). Strickland has not established the purposeful animus required under *Washington v. Davis* and *Feeney*. Nor is there anything on the record that would tend to undermine the legislature's conclusion that fathers are in the best place to prevent the effects of fraud. And if we cannot

even refute this factual assertion, we certainly cannot view it as evidence of the kind of purposeful animus necessary to sustain Strickland's disparate impact claim.

### D. Fifth Amendment Right Against Self-Incrimination

¶54  In his most wide-sweeping constitutional challenge, Strickland claims that the requirements of the Adoption Act infringe his Fifth Amendment right against self-incrimination. The claimed incrimination is for the crime of fornication—a law still on the books in our criminal code. *See* UTAH CODE § 76-7-104. And Strickland asserts that the filing requirements of the Adoption Act would have put him on record as admitting to that crime.

¶55  This claim fails in its basic premise. The "mere possibility of incrimination is insufficient" to implicate the Fifth Amendment. *California v. Byers*, 402 U.S. 424, 428 (1971). Under well-settled precedent, the Fifth Amendment protects against "real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478 (1972). And Strickland has not established a real danger of incrimination. The crime of fornication has not been prosecuted in Utah in quite some time, so the incrimination asserted by Strickland is no more than a remote, speculative possibility. We reject his challenge on that basis.

### E. Open Courts Clause

¶56 Strickland's next claim arises under the Open Courts Clause of the Utah Constitution. UTAH CONST. art. I, § 11. This provision guarantees that "[a]ll courts shall be open," and assures that "every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law." *Id.*

¶57  The terms of this provision have spawned extensive debate in our opinions. A central point of discussion has concerned the question whether the Open Courts Clause conveys "substantive" protection against the abrogation of common law causes of action or merely a "procedural" guarantee of access to courts for the vindication of any claims or defenses protected by law generally (including under statutes overriding common-law principles).[11] The court's majority has embraced a substantive conception of the

---

[11] *Compare Laney v. Fairview City*, 2002 UT 79, ¶¶ 30–48, 57 P.3d 1007, *with id.* ¶¶ 115–131 (Wilkins, J., dissenting).

open courts protection since at least *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). Yet the court has long been closely divided on that issue.[12]

¶58 We have not been asked to revisit that question here. And this would not be an appropriate case in which to do so given the shortcomings of Strickland's briefing. Although Strickland purports to invoke the *substantive* dimension of the Open Courts Clause, he is not ultimately asserting a substantive claim—that the Adoption Act has "abrogate[d] a cause of action" existing at common law without providing a "reasonable alternative remedy" that is "substantially equal in value or other benefit." *Laney v. Fairview City*, 2002 UT 79, ¶¶ 50, 54, 57 P.3d 1007 (internal quotation marks omitted). Strickland is simply not seeking a "remedy" for an "injury done to him." UTAH CONST. art. I, § 11. He has not asserted a cause of action for damages. Nor is there anything in the Adoption Act that would prevent him from pursuing such a cause of action—by suing the birth mother or any other party who may be liable to him in tort.

¶59 Accordingly, this is not a case that implicates the substantive open courts standard set forth in *Berry* and *Laney*. And Strickland has not briefed a procedural open courts claim. We reject Strickland's argument for these reasons.

### F. The Parental Kidnapping Prevention Act

¶60 Strickland's final claim arises under the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A. He cites this statute as somehow superseding the terms of the Utah Adoption Act under the Supremacy Clause. But the PKPA is a full faith and credit statute; it requires that a court of one state "shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions" of the PKPA.

---

[12] *See Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, 974 P.2d 1194 (upholding *Berry* over lengthy dissent by Justice Zimmerman, an original supporter of *Berry*); *Day v. State ex rel. Utah Dep't of Pub. Safety*, 1999 UT 46, 980 P.2d 1171 (same); *Laney*, 2002 UT 79 (same, with Justice Wilkins and Associate Chief Justice Durrant dissenting).

*Id*. § 1738A(g). Here there is no proceeding pending in another state, and thus no application for the PKPA.

### G. Motions for Discovery and to Disqualify

¶61    Strickland's last ground for appeal is his challenge to the district court's denial of his motions for discovery and to disqualify opposing counsel. The discovery motion was aimed at identifying additional factual support for Strickland's constitutional claims. The disqualification motion asserted that opposing counsel had failed to disclose to the adoption court various details concerning the dismissal of Strickland's untimely paternity filing. We affirm the district court's decision denying these motions.

¶62    The district court denied the discovery motion on the ground that Strickland had no right to intervention and thus no right to discovery. We agree with Strickland that that determination was circular. But we nonetheless affirm because we conclude that the material that Strickland was seeking would have made no difference to the resolution of his constitutional claims.

¶63    The disqualification motion was also rightly denied. As with the discovery material, the material that Strickland accuses opposing counsel of withholding would have made no difference to the resolution of this case. We affirm the denial of this motion on that basis.

_____