**2021 UT 22**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

MELVIN C. MCQUARRIE,
*Appellant,*

*v.*

JANETTE COLLEDGE MCQUARRIE nka JANETTE KENDALL,
*Appellee.*

No. 20190902-SC
Heard March 5, 2021
Filed June 17, 2021

On Petition for Writ of Certiorari to the Utah Court of Appeals

Third District, Salt Lake
Honorable Robert P. Faust
No. 084904419

Attorneys:

Julie J. Nelson, Erin B. Hull, James A. McIntyre, Richard R. Golden, Salt Lake City, for appellant

David L. Arrington, Douglas B. Thayer, Melinda H. Birrell, Lehi, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE AND JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 As a general rule, a stipulated divorce decree is interpreted in accordance with the law of contract interpretation—with the goal of discerning the intentions of the parties, as reflected in the ordinary meaning of the terms of the decree as a whole. But that general rule is subject to a specific statutory exception. If a divorce decree calls for payment of alimony, the payment is presumed to terminate upon remarriage of the receiving spouse, and the presumption is rebutted only if the

divorce decree "specifically provides otherwise." UTAH CODE § 30-3-5(9) (2015).

¶2   As the district court and the court of appeals in this case noted, the divorce decree at issue included provisions that, taken as a whole, could be interpreted to suggest that the parties contemplated that alimony would continue upon remarriage. But that is insufficient. Under the above-quoted statute as interpreted in our case law, the presumption that alimony terminates upon remarriage is rebutted only by a "specific[]" alimony provision that expressly "provides otherwise." There was no such specific, express provision in the decree at issue here. And we reverse the decision of the court of appeals on that basis.

I

¶3   Melvin McQuarrie and Janette Colledge McQuarrie (now known as Janette Kendall) married in 1980 and divorced in 2008. The district court entered a divorce decree detailing the terms of their mediated stipulation for divorce.

¶4   Under paragraphs 9 and 10 of the stipulated decree, Melvin[1] was required to pay alimony to Janette in two phases. First, during the period in which Melvin was required to pay child support, he was required to make a $2,000 monthly alimony payment (subject to cost-of-living increases) "until the first of any of the following occurrences: a. [Melvin's] death; or b. [Janette's] death." Second, after the child support obligation ended, Melvin was required to make an increased alimony payment to Janette "until the first of any of the following occurrences: c. [Melvin's] death; d. The expiration of 372 months from the signing of the decree of divorce; or e. [Janette's] death."

¶5   The alimony provisions of the decree do not explicitly address the effect of Janette's remarriage. But other provisions of the decree do refer to the possibility of her remarriage, either expressly or by implication.

¶6   In paragraph 11, the decree requires Melvin to pay $1 million to an annuity underwriter of Janette's choice, with Janette "irrevocably designated as the beneficiary of the annuity during her lifetime with the power to designate any blood relative as the

---

[1] We use first names to avoid any confusion. No disrespect is intended by the informality.

beneficiary of any death benefit provided by the annuity." The power to designate a beneficiary of a death benefit is expressly limited, however. "[I]n the event [Janette] remarries, she may not designate her spouse or his children as beneficiaries, even if she were to adopt them." The expressed "intention of the parties" was "that the annuity is solely for the benefit of [Janette] and no one else." It was "anticipated that the annuity [would] provide a stream of income to [Janette] for her lifetime sufficient to supplement what [Melvin] pays as alimony."

¶7   A footnote to the annuity provision states that Janette is "ordered to be responsible for her utilities, maintenance, taxes and insurance on the marital home" (which was awarded to Janette) after she "is eligible to receive the annuity." It also provides for a meeting, to be held every three years, to allow the parties "to review their respective standard of living" and to make any necessary "upward" adjustment of "alimony beyond the" Consumer Price Index. "The standard of living [was] ordered to be equal." And the meeting was aimed at facilitating an exchange of information of relevance to the assessment and equalization of the parties' standard of living. Each party was required "to update any new documentation to the mediation binder, including new property holdings/assets, increased earnings, bonuses, and/or royalties, and business to debt ratio." Melvin and Janette were to meet "without spouses or attorneys," but "if necessary," they could "agree upon a mediator" to be present.

¶8   The decree also makes reference to remarriage in a few provisions addressing division of property. It states that Melvin is required to "pay the first deed of trust" on the marital home and to pay for "utilities, lawn care, snow removal, upkeep, maintenance, [and] a housekeeper" for the home, while providing that Melvin is relieved of the latter responsibilities (but not the payment of the first deed of trust) if Janette remarries. It also requires Melvin to purchase or lease a car for Janette every five years, but provides that that obligation ceases if Janette remarries. And it orders Melvin and Janette to "enter into a prenuptial agreement prior to any remarriage," while prohibiting them from divesting assets to future spouses and restraining them from disclosing the terms of the decree to such spouses.

¶9   Janette remarried in 2014. Later that year, she filed a petition to modify the divorce decree, asserting that Melvin had defrauded her in failing to disclose certain assets and misrepresenting the value of the marital home. She also filed a

motion seeking to have Melvin held in contempt for failing to make certain payments required under the decree.

¶10 Melvin filed a counter-petition to modify the decree. In the counter-petition, Melvin asserted that Janette's remarriage constituted a "substantial and material change in the parties' circumstances" justifying a termination of the alimony obligation. Citing Utah Code section 30-3-5(9) (2015), Melvin contended that the alimony obligation terminated as a matter of law upon Janette's remarriage because the decree did not "specifically provide" that alimony would continue after her remarriage.

¶11 The district court denied both parties' motions. In denying Melvin's motion, the court considered "all the language in" the decree and concluded that the alimony provisions "were not something that would be terminated or eliminated based upon the remarriage" of Janette. And it held that the decree "language specifically provides that the alimony/child support payments would continue beyond remarriage and were structured to provide the appropriate division of the marital assets" to Janette.

¶12 Melvin challenged that decision on appeal, again citing Utah Code section 30-3-5(9) (2015) and again asserting that his alimony obligation terminated because the divorce decree did not "specifically provide" that the alimony payment was to continue after Janette's remarriage. The court of appeals affirmed. *See McQuarrie v. McQuarrie*, 2019 UT App 147, 450 P.3d 1133. It acknowledged that "[a]limony is presumed to terminate upon the remarriage of the receiving spouse" and noted that this presumption "is now codified in" Utah Code section 30-3-5(9) (2015). *Id.* ¶ 28 (citation omitted). But it did not elaborate on the requirement of a decree provision that "specifically provides" that alimony payments are to continue after remarriage. Like the district court, it turned instead to the terms of the decree "as a whole." *Id.* ¶ 31. And it stated that its role was to "ascertain the intentions of the parties" to the decree with regard to the payment of alimony. *Id.* ¶ 29 (citation omitted). Citing not just the alimony provisions but the terms of other provisions of the divorce decree, the court of appeals concluded that the decree "specifically provides that alimony would survive Janette's remarriage." *Id.* ¶ 31.

¶13 The court noted that the decree provided that Melvin's obligation to provide a car allowance and to pay certain household expenses would terminate upon Janette's remarriage.

*Id.* It also credited the footnote calling for a meeting between the parties to review their standard of living and make any necessary adjustment to alimony payments—noting that that provision prohibited the attendance of the parties' "spouses," which the court viewed as an acknowledgement of the possibility that both Melvin and Janette might have remarried at a time when they would be meeting to discuss an adjustment to alimony payments. *Id.* ¶ 33. And it cited other provisions of the decree referring to the possibility of Janette's remarriage—including the prohibition on naming a future spouse as beneficiary of the annuity and the requirement that Melvin continue to pay the mortgage on Janette's home even if she were to remarry. *Id.* ¶ 35.

¶14 As to the alimony provisions themselves, the court of appeals noted that they identified Janette's death, but not her remarriage, as an event that would terminate the alimony payment. In the court of appeals' view, these provisions would be "meaningless" if they were interpreted to allow for termination of alimony upon Janette's remarriage. *Id.* ¶ 32.

¶15 On these grounds, the court of appeals concluded that "the parties considered Janette's potential remarriage and specifically agreed on how that event would affect their respective rights and obligations" under the decree. *Id.* ¶ 35. It held that "the only 'reasonable' interpretation" of the decree "as a whole is that alimony terminates only as expressly provided"—upon Janette's death, Melvin's death, or 372 months from the date of execution of the decree. *Id.* The cited "provisions," in the court's view, "strengthen an inference that the parties intentionally omitted remarriage" from the list of events that would terminate Melvin's alimony obligation. *Id.* ¶ 31. And on that basis, the court of appeals held that the decree as a whole "specifically provides" that alimony was to continue despite Janette's remarriage. *Id.* ¶ 36.

¶16 Melvin filed a petition for writ of certiorari, which we granted. We review the court of appeals' decision de novo, according no deference to its decision. *State v. Lujan*, 2020 UT 5, ¶ 18, 459 P.3d 992.

¶17 We consider first Melvin's challenge to the court of appeals' determination that the divorce decree "specifically provides" for payment of alimony after remarriage. We then take up a further request made by Melvin—that we enter an order disgorging the alimony payments he has made in the period after Janette's remarriage. We reverse the court of appeals, decline to

enter an order of disgorgement, and remand to the district court for any further proceedings that that court may deem appropriate.

II

¶18 As a general rule, a stipulated divorce decree is interpreted as if it were a contract between the parties. Parties to a divorce are bound by the terms of their stipulated agreement. *See Thayer v. Thayer*, 2016 UT App 146, ¶ 17, 378 P.3d 1232; *see also Higley v. McDonald*, 685 P.2d 496, 499 (Utah 1984) (parties bound by terms of stipulated agreement in property boundary dispute). And the court's goal in interpreting such a document is to credit the agreed-upon terms of the stipulation under "established rules of contract interpretation." *Thayer*, 2016 UT App 146 ¶ 17 (citation omitted). In so doing, a court should consider each provision of a decree "in relation to all others, with a view toward giving effect to all and ignoring none." *Id.* (citation omitted).

¶19 We see a basis for the court of appeals' decision under this standard of interpretation. Several of the terms of the divorce decree make reference to the possibility of Janette's remarriage. And the alimony provisions themselves list conditions other than remarriage (death of one of the parties or expiration of a 372-month period) as grounds for termination of Melvin's alimony obligation. With this in mind, we can see why the court of appeals found a basis for an "inference that the parties intentionally omitted remarriage" from the list of events that would terminate Melvin's alimony obligation. By stating that alimony would terminate upon Melvin's or Janette's death or after a period of 372 months, it is entirely possible that the parties to the decree were contemplating that there were no other events (such as Janette's remarriage) that would cut off the alimony payment.

¶20 This inference, moreover, may be strengthened by other provisions of the decree. A key provision, as the court of appeals noted, is the footnote calling for a meeting—without "spouses"—to review the parties' standard of living and make any necessary alimony adjustments. That provision implicitly seems to contemplate the possibility of an alimony adjustment made after Janette remarried, since it prohibits the attendance of "spouses" (plural).

¶21 For these reasons, we likely would be affirming the court of appeals if we agreed that the effect of remarriage on the alimony payment were a matter of discerning the parties' likely intentions as reflected in the terms of the divorce decree

interpreted as a whole. But that is not the standard. By statute, a party's obligation to make alimony payments is distinct from other terms and conditions of a divorce decree. If a decree sets forth an obligation to pay alimony, the payment obligation is legally presumed to terminate upon remarriage of the receiving spouse. *See* UTAH CODE § 30-3-5(9) (2015). And the presumption is rebutted not by a showing of the parties' contrary intentions as evidenced by the terms of the divorce decree as a whole, but by a specific proviso to the contrary in a provision addressed to the payment of alimony. *See id.*

¶22 This follows from the governing text of the controlling statute. "Unless a decree of divorce specifically provides otherwise, any order of the court that a party pay alimony to a former spouse automatically terminates upon the remarriage or death of that former spouse." *Id.* The statute prescribes the presumptive effect of the terms of an "order of the court that a party pay alimony to a former spouse." Such terms are to be interpreted to "automatically terminate[] upon the remarriage or death" of the former spouse. This presumption is rebuttable. But the rebuttal must be in the manner set forth by statute: The "decree of divorce" must "specifically provide[] otherwise."

¶23 A divorce decree "specifically provides otherwise" only if there is a provision that speaks directly to the alimony payment in terms that explicitly prescribe a payment obligation that persists despite remarriage. This is clear from the language and structure of the statute. A divorce decree "specifically" overrides the statutory presumption only where it speaks *specifically* to the alimony payment obligation. And it "provides otherwise" only in a *provision* of the decree that contradicts the presumption—in stating *otherwise* (contrary to the statutory presumption) that alimony will continue despite remarriage.

¶24 This interpretive standard is reinforced in Utah case law. In *Lord v. Shaw*, we considered a divorce decree stating that "alimony [was] to run for a period of three years," entered under a statute essentially identical to the provision at issue here. 682 P.2d 853, 855 (Utah 1984)), (citing UTAH CODE § 30-3-5(2) (Supp. 1983)), *abrogated on other grounds by Bailey v. Sound Lab*, 694 P.2d 1043 (Utah 1984). After remarriage, the receiving spouse asserted a right to continued alimony during the agreed-upon three-year period. She contended that the parties understood that alimony was to continue "for three years regardless of her marital status." *Id.* And she asserted that the three-year period was aimed at

"assist[ing] her with her education, which would take three years." *Id.*

¶25 In *Lord* we nowhere refuted the receiving spouse's assertions about the parties' intentions under the divorce decree, or denied the inference that could be drawn from the decree's proviso that alimony would continue "for a period of three years." But we noted that the duty to pay alimony is presumed to terminate upon remarriage unless the divorce decree "specifically provides otherwise." *Id.* (citing UTAH CODE § 30-3-5(2) (Supp. 1983)). And we held that the decree did not "provide for an exception to the general rule that alimony terminates upon remarriage" because it did not include a specific proviso calling for payment of alimony after the receiving spouse's remarriage. *Id.*

¶26 The divorce decree at issue in this case is admittedly more detailed than the one presented in *Lord*. And in some ways, the decree at issue here may provide an even stronger basis for an inference that the parties may have contemplated the possibility of alimony payments continuing after remarriage of the receiving spouse. But the controlling statute does not provide for rebuttal of the underlying presumption by inference. It requires a specific proviso that alimony continues after remarriage. And the absence of such proviso is as controlling here as it was in *Lord*.

¶27 In so holding, we are not requiring the inclusion of talismanic phrases or magic words. We are simply following the dictates of the statute as interpreted in the case law. And we are accordingly holding that the presumption that alimony terminates upon remarriage is not rebutted by inference but only by a specific proviso that such payments will continue after the receiving party remarries.

¶28 Janette warns of the possibility of a "trap" for the "unwary" if "technical" words are required to rebut the statutory presumption. And she asserts that there is "no discussion" in the legislative history indicating that the legislature "intended" to "require elevated precision in language or the placement of such language in a dedicated 'proviso.'"

¶29 We accept some of the threshold premises of Janette's arguments. But we do not view them as undermining our holding.

¶30 As to the first point, we again emphasize that the governing standard does not require any particular precision or

use of technical language. It just requires a specific proviso that alimony payments are to continue despite remarriage. Perhaps some parties to a divorce will be unaware of the governing legal standard. But the statute states the governing standard. And the public is charged with knowledge of its terms and conditions— ignorance of the law is no excuse. *See In re Adoption of B.Y.*, 2015 UT 67, ¶ 19 n.3, 356 P.3d 1215.

¶31 On the second point, we concede that the requirement of a "dedicated 'proviso'" is nowhere articulated in the legislative history. But "[l]egislative history is not law." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 64, 345 P.3d 619. The law is set forth in the statutory text that was voted on by the legislature. *See id.* ¶¶ 64–65 (stating that the law is the "statutory text" as "duly enacted" by the legislature). And we cannot foreclose an interpretation of the text on the ground that there is no evidence that it was considered openly on the legislative record. Such a decision would invert the premises of the legislative process, giving "primacy to legislative history, and only secondary significance to the duly enacted statute." *Id.* ¶ 65 (explaining that this would "turn a core principle of statutory construction on its head").

¶32 Janette's objections ultimately are matters to be taken up, if at all, by the legislature. Perhaps that body could be persuaded that the effect of remarriage on an alimony clause should be a matter controlled purely by an inquiry into the likely intentions of the parties to the divorce decree. And if the legislature so concluded, it certainly could amend the operative statute, and thereby subject alimony provisions to a contract-based standard of interpretation.

¶33 But that is not our law as now written. And we see some wisdom in the law as it stands. The statutory presumption is a gap-filler. It sets a legal presumption based on an educated guess about the likely intentions of the parties to most divorce actions. And it facilitates the process of finalizing the divorce decree by setting a presumptive rule that remains in place unless expressly repudiated.[2]

---

[2] *See* William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 Harv. L. Rev. 1079, 1100–02 (2017) (identifying these and other justifications for gap-filling canons of contract interpretation).

¶34 The statutory presumption seems rooted in a fair guess about the likely intentions of the parties to most divorce decrees. And the standard, as stated in our law, provides a clear background rule that parties can negotiate around. If the parties wish to depart from the background presumption, they must do so explicitly in a proviso stating that alimony payments are to continue after remarriage. If they fail to "specifically" so "provide," the statutory presumption is retained.

¶35 We reverse the court of appeals on this basis. The divorce decree in this case does not include a specific provision stating that alimony is to continue despite remarriage. The alimony provision identifies events other than remarriage that will trigger the termination of alimony. And that, combined with other references to remarriage in the decree, could be viewed to support an inference that the parties contemplated that alimony would continue despite the receiving spouse's remarriage. But such an inference is insufficient under our law. And we conclude that Melvin's alimony obligation terminated by operation of law because the decree did not "specifically provide[] otherwise."

### III

¶36 In addition to seeking reversal of the decision of the court of appeals, Melvin asks us to enter an order disgorging the alimony payments he has made to Janette after her remarriage. We decline to consider the disgorgement question in the absence of any analysis of the matter in the proceedings below. Instead, we reverse and remand the matter to the district court for any further proceedings the district court may deem appropriate.

¶37 In remanding, we are taking no position on the propriety or availability of any request for disgorgement or of the proper direction of any further proceedings on remand. We leave the matter to the sound discretion of the district court, with appropriate input from the parties.